## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| ALI NEJAD, | : | CIVIL ACTION NO. |
| GDC ID # 1206892, Case # 594589, | : | 1:12-CV-01502-TWT-JCF |
|    Petitioner, | : | |
| | : | |
|    v. | : | |
| | : | |
| GREGORY McLAUGHLIN, | : | HABEAS CORPUS |
|    Respondent. | : | 28 U.S.C. § 2254 |

## MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

Petitioner, a Georgia prisoner, challenges via his counseled 28 U.S.C. § 2254 habeas corpus petition his December 2005 judgment of conviction in the Superior Court of Fulton County for rape and related crimes. (Doc. 1 at 1-2). Petitioner's Motion for Leave to file Response to Answer to Habeas Petition (Doc. 13) is **GRANTED.** Before the Court are the habeas petition (Doc. 1); Respondent's answer-response (Doc. 8) with supporting brief (Doc. 8-1) and exhibits (Docs. 9-12); and Petitioner's response (Doc. 14). For the reasons set forth below, **IT IS RECOMMENDED** that Petitioner's habeas corpus petition be **DENIED** and that he be **GRANTED** a certificate of appealability on two issues:

(1)    Did trial counsel's failure to inform Petitioner of his right to testify violate

                Petitioner's Sixth Amendment right to the effective assistance of counsel, as

guaranteed by the Fourteenth Amendment's due process clause?

(2)     Did the trial court's jury instruction on the presence of a deadly weapon *per se*

violate the Fourteenth Amendment's requirement that the State prove every

element of a criminal offense beyond a reasonable doubt?

## I.     <u>Procedural History</u>

### A.     <u>The Trial Court Denied Petitioner's Motion For New Trial.</u>

In December 2005, "[a] Fulton County jury convicted [Petitioner] of rape, aggravated sodomy, aggravated assault with a deadly weapon (two counts), and aggravated battery (two counts)."  *Nejad v. State*, 674 S.E.2d 60, 61 (Ga. Ct. App. 2009) ("*Nejad I*"), *rev'd*, *State v. Nejad*, 690 S.E.2d 846 (Ga. 2010) ("*Nejad II*"); (*see* Doc. 1 at 1).  Petitioner received a fifteen-year sentence for rape and two consecutive ten-year sentences for aggravated assault, plus three concurrent ten-year sentences for aggravated sodomy and aggravated sexual battery.  (Doc. 1 at 2).

Petitioner filed a motion for new trial, raising, *inter alia,* the three claims that he also raised on direct appeal.  *See Nejad I*, 674 S.E.2d at 61 ("On appeal, [Petitioner] argues that his convictions must be reversed for three reasons: (1) the trial court erroneously charged the jury that a pellet gun was a per se deadly weapon; (2) a juror failed to disclose that she was a rape victim; and (3) trial counsel was

2

ineffective."). Judge Bedford, who had presided at Petitioner's trial, recused himself from the case. (Doc. 9-6 at 81). Judge Baxter conducted a hearing on the new-trial motion (Doc. 12-2) and denied it (Doc. 9-6 at 83-86). He found that none of Petitioner's three defense attorneys (Arora, Trost, and Joshi) "could swear positively that Judge Bedford did not inform [Petitioner] that the ultimate decision to testify was his and not the attorney's. Conversely, [the prosecutor] did swear positively that Judge Bedford did inform [Petitioner] that the decision whether to testify was his and his alone." (Doc. 9-6 at 85). "She further recalled that [Petitioner] stood in open court and informed Judge Bedford that he did not wish to testify." (*Id.*). Accordingly, Judge Baxter found "as fact that [Petitioner] failed to prove prejudice from any failure of trial counsel to properly define his right to testify, inasmuch as the credible evidence at the hearing shows that [Petitioner] was in fact so informed by the trial court that the ultimate decision whether to testify was his alone, made after hearing the advice of his attorneys." (*Id.* at 86). Judge Baxter denied without comment Petitioner's remaining grounds for relief. (*Id.*).

### B.   The Georgia Court Of Appeals Ordered A New Trial.

The Georgia Court of Appeals reversed the new-trial court's order, finding that "trial counsel provided ineffective assistance when he refused to allow [Petitioner]

AO 72A
(Rev.8/82)

to testify and did not inform [him] that he had a right to do so," and also that the trial court erred in its "charge to the jury that a pellet gun was a per se deadly weapon." *Nejad I*, 674 S.E.2d at 61. The court found that the evidence presented at Petitioner's trial, when viewed in the light most favorable to the jury's verdict, was sufficient under *Jackson v. Virginia*, 443 U.S. 307 (1979), to support that verdict, and summarized the evidence as follows:

> [T]he record shows that there were two alleged victims of the crimes for which [Petitioner] was tried, Linda Lankford and Melissa Hoy. Lankford testified that on May 11, 2004, she was talking to [Petitioner] at a gas station, and he offered her a ride to the hotel where she was staying. Lankford recalled that [Petitioner] was driving a SUV and that there was a baby car seat in the back of the vehicle. During the ride, [Petitioner] offered her $ 200 in exchange for sex or an agreement to masturbate him, and Lankford refused, telling [Petitioner] that she was not a prostitute. Lankford recalled that they also talked about smoking marijuana and that [Petitioner] told her that he and his friends smoked behind a building where he worked. After purchasing baby wipes from a grocery store, [Petitioner] drove Lankford to a secluded area where he parked the SUV near a factory, which Lankford assumed was [Petitioner's] place of employment. [Petitioner] then pointed a gun at Lankford, demanded that she take off her clothes and put on pantyhose with a hole in the crotch area, and made her perform oral sex on him, while pointing the gun at the back of her head. [Petitioner] also had intercourse with Lankford after ordering her to remove a tampon from her body. [Petitioner] then ejaculated on Lankford's stomach and gave her a baby wipe to clean up. Lankford recalled that the gun was pointed at her face while they had intercourse. When they were done, [Petitioner] ordered Lankford to exit his vehicle, naked with her clothes in her hand. Lankford dressed herself with the clothes that she could

4

find and then ran to a nearby building where she banged on the door and told the people inside to call the police because she had been raped.

David Vance, a supervisor at the building, testified that Lankford was pounding on the door and was hysterical as she screamed and hollered that she had been raped. Detective Lisa Roey of the Atlanta Police Department testified that she responded to the scene and interviewed Lankford. Lankford told her that she agreed to accept $ 200 from [Petitioner] to watch him masturbate because she needed the money as she was new to Atlanta. When Roey went to the scene of the crime, she found Lankford's identification, hotel room key, pictures of Lankford's children, a tampon, and some baby wipes.

Melissa Hoy testified that she was a prostitute and that she voluntarily entered [Petitioner's] white SUV on June 5, 2004, after [Petitioner] offered her $ 150 to perform sexual acts. [Petitioner] gave her thigh-high nylon stockings to wear and drove to a secluded area. Hoy further testified that once [Petitioner] stopped the vehicle, he took a backpack and a black gun from the back of the vehicle, which was later determined to be a plastic pellet gun, put the baby car seat into the back of the vehicle, and told Hoy to get into the back seat. [Petitioner] urinated and then got into the back seat with Hoy. When asked why she did not run away, Hoy testified that she could have but that "it was a job." [Petitioner] fondled and digitally penetrated Hoy's anus and vagina while holding the gun, then put the gun down while he masturbated. Over two hours later, [Petitioner] ejaculated, using Hoy's clothing to clean up the semen. [Petitioner] gave Hoy her clothes and told her to exit the vehicle and said he would leave $ 100 on the concrete at the end of the street. Hoy never looked for the money. Instead, she dressed herself then walked to a nearby restaurant where she called a client, who picked her up and with whom she had sex in exchange for money. Weeks later, Hoy spoke to another prostitute to warn her about the driver of the white SUV, and that person advised that she already knew about him.

At trial, [Petitioner] stipulated that the semen from Hoy's shirt contained his DNA as did the assault kit performed on Lankford. When [Petitioner] was arrested, a plastic pellet gun, which looked like a Glock handgun, was found in his vehicle.

*Id.* at 61-62.

The Georgia Court of Appeals found that Petitioner's counsel had provided ineffective assistance by failing to advise him properly about his right to testify.  It summarized the relevant testimony at the new-trial hearing as follows:

[T]rial counsel unequivocally stated on several occasions that he told [Petitioner] that he was not testifying; that he ordered [Petitioner] to inform the court that he was not going to testify; that he told [Petitioner] that he ruled with an iron fist and that [Petitioner] would have to do as instructed; that [Petitioner's] family asked about him testifying to explain the situation with the gun and he told them that [Petitioner] was not testifying; and that he did not advise [Petitioner] of his right to make the final decision about testifying at trial. Trial counsel testified that he was proud of his reputation, but that he wrongfully made the decision about whether [Petitioner] would testify. Trial counsel also explicitly recalled that the trial judge did not advise [Petitioner] of his right to testify.

Investigator Nicholas McKnight testified that he attended a meeting with [Petitioner] and trial counsel in which [Petitioner] expressed his desire to testify and trial counsel replied that under no circumstances would [Petitioner] be allowed to testify. McKnight also recalled that during that meeting, trial counsel did not inform [Petitioner] of his right to testify. Two attorneys assisted trial counsel in the trial of the case, and both testified that they neither advised [Petitioner] that he was the person who would ultimately decide whether he would testify nor heard anyone else explain this right to [Petitioner],

6

including the trial judge. The prosecutor testified that she specifically recalled the trial judge reading [Petitioner] the standard admonition about testifying or not testifying and that a couple of months before the new trial hearing, [Petitioner's] defense counsel acknowledged to her that he remembered the judge's admonition as well even though it was not recorded in the transcript. There is a stipulation in the record, however, that the trial judge reviewed his notes from the trial and stated that there was no indication in his notes that he ever advised [Petitioner] of his right to testify.

. . . .

[Petitioner] indicated at the motion for new trial hearing that he was compelled to remain silent. Specifically, he testified that he repeatedly told his trial counsel that he wanted to testify both before trial and during the trial, but his attorney would not allow him to do so; that his trial counsel never told him that the final decision about whether to testify was his; that he believed that the decision was to be made by his lawyer; that no one ever explained that it was his decision, including the court; and that had he known it was his right to testify, he would have exercised that right. . . .

When asked what his testimony would have been at trial, [Petitioner] testified that on the night in question, he drove to an area where he knew he could find prostitutes; that Lankford approached his car, they talked, and he agreed to give her a ride; that Lankford asked him if he were a cop and when he said he was not, told him it would be $200 for everything; that he purchased condoms, pantyhose, and snacks for Lankford; and that when Lankford asked him about the pantyhose, he told her that he thought they were sexy. [Petitioner] further testified that Lankford voluntarily performed oral sex on him and then when they were about to have intercourse, told him that she was on her period, which annoyed him; that Lankford assured him that it would not be a problem but asked for a napkin to remove her tampon, and he gave her a baby wipe; that he decided he no longer wanted to have sex with

7

Lankford after watching her remove the tampon; and that he asked Lankford for half of the money back, and she refused. [Petitioner] recalled that he exited the car to fix his clothes then saw Lankford jump out with only her shirt on and the rest of her clothes in her hand and run across the parking lot and that he yelled at her that he would send the cops to her hotel. [Petitioner] then left the scene after throwing Lankford's personal items from the window. [Petitioner] testified that he told his trial counsel what happened. He denied that he committed any of the acts for which he was charged against Lankford.

Regarding the second victim, Hoy, [Petitioner] testified that he picked her up from the same area; that Hoy asked him to stop and buy her some doughnuts and he complied; that they went to a secluded location where she willingly performed oral sex on him in exchange for $ 40; and that she asked him to drop her off at a hotel, which he did. Again, [Petitioner] denied that he committed any of the indicted offenses or that he had a replica of a gun. When asked about the fact that both women talked about a gun, [Petitioner] explained that he kept a pellet gun in his glove compartment, which is where he kept his money clip, so both women would have seen it when he retrieved his money clip and both women were left alone in his car at some point. [Petitioner] maintained that he never removed the pellet gun from the glove compartment. [Petitioner] also testified that on the night that Hoy claims she was assaulted by him, he was with his wife and friends at a club. One of the friends and [Petitioner's] wife at the time of the incident both testified that they were with [Petitioner] on that night.

*Id.* at 62-63, 64 (footnote omitted).  Based on the foregoing, the Georgia Court of

Appeals concluded:

Issues regarding the credibility of witnesses [remain] in the sole province of the jury. In this case, the jury heard the testimony of the victims and [Petitioner's] stipulation that the physical evidence contained his DNA but did not hear from [Petitioner] that the sexual acts

8

> involved were consensual. A defendant's testimony could be crucial in any trial, and as an appellate court, we cannot conclude that the jury would not have found [Petitioner's] testimony credible, and thus the error was harmless. Therefore, despite the evidence against Nejad, we cannot ignore the violation of his constitutional right to testify and must reverse the convictions due to trial counsel's ineffectiveness.

*Id.* at 64-65 (footnotes and quotations omitted); *see id.* at 64 ("Accordingly, based on the testimony of defense counsel and [Petitioner], we find that trial counsel's refusal to allow [Petitioner] to testify and failure to advise [Petitioner] of his right to testify constituted deficient performance and that [Petitioner] has shown that this failure prejudiced his defense.").

Regarding the trial court's charge to the jury that Petitioner's pellet gun was per se a deadly weapon, the Georgia Court of Appeals stated:

> It is well established that when a weapon is not a per se deadly weapon, it may become one depending on the manner and means by which it was used, but that question is for the jury to resolve. Because the court's charge removed this issue from the jury's province, we find the charge was erroneous.

*Id.* at 65 (footnote omitted) (citing 1983 Georgia Court of Appeals opinion that "the 'deadliness' issue in regard to an air rifle is for the jury" to decide). The court did not address Petitioner's remaining issue, regarding a petit juror's failure to disclose relevant information about her past, "as it [would] not recur upon retrial." *Id.*

9

**C.**     **The Supreme Court Of Georgia Reinstated The Convictions.**

The State appealed, and the Supreme Court of Georgia reversed the Georgia Court of Appeals' ruling.  *Nejad II.*

**1.**     **Petitioner's Ineffective Assistance Claim**

With respect to Petitioner's ineffective assistance claim, the Supreme Court of Georgia noted:

> Following [Petitioner's] employment of post-conviction counsel and the filing of a motion for new trial contending trial counsel had rendered ineffective assistance, the trial court conducted a hearing at which [Petitioner] testified that his lead trial counsel had not informed [him] of his right to testify and had refused to permit [him] to testify at his trial despite [his] desire to do so. Lead trial counsel testified at the hearing and admitted he had engaged in the conduct to which [Petitioner] had testified.  The assistant district attorney who prosecuted [Petitioner] testified at the hearing that she had a vivid recollection of the trial judge informing [Petitioner] that he had the right to testify and that it was [Petitioner's] decision whether to exercise that right, and of [Petitioner] waiving that right; [Petitioner] and his trial counsel testified at the hearing that the trial judge did not so advise [Petitioner]. Another of [Petitioner's] trial attorneys testified that the attorneys representing [Petitioner] were in agreement it was not in his best interest to testify and that the attorney originally thought the trial judge had made [Petitioner] aware of his right to testify because "that was consistent with normal practice." The attorney testified that while he could not say it did not happen, his recollection did not support that it had happened. The third defense attorney testified it was "a general practice of most courts" to ensure the non-testifying defendant was aware of his right to testify, but he had no specific memory of the trial court engaging in such a colloquy with [Petitioner].

AO 72A
(Rev.8/82)

*Nejad II*, 690 S.E.2d at 848 (citation and footnote omitted).

> In response to the query of post-conviction counsel for [Petitioner] as to the location of the colloquy between the trial judge and [Petitioner] in the trial transcript, the State freely admitted it was not in the transcript and . . . [asserted] that the colloquy had taken place in open court without having been recorded. Two weeks after the evidentiary hearing, the parties submitted a stipulation that the trial judge had "reviewed his notes from [Petitioner's] trial and stated that he does not have any indication in his notes that he ever advised [Petitioner] of his rights to testify."

*Id.* at 849.  The Supreme Court of Georgia noted further that "[t]he trial court conducted an evidentiary hearing regarding the conflict and resolved it by concluding that the trial judge had made [Petitioner] aware of his right to testify and his right to decide whether he would testify."  *Id.* at 850.

> In effect, the trial transcript has been amended by the trial court's determination[,] to show that [Petitioner] was made aware of his right to testify and to have the final say in whether he exercised that right.  In light of the finality of that decision, the Court of Appeals was not authorized to reverse the trial court's determination that [Petitioner] had been advised of his right to testify by the trial judge.

*Id.*

After indicating that the new-trial court's "adoption of the prosecutor's [testimony] was dispositive, and . . . not subject to [appellate] review" (*id.* (internal quotations omitted)), the Supreme Court of Georgia nevertheless noted the following

11

support for the new-trial court's disposition of the ineffective-assistance claim:

> [T]here was evidence presented at the hearing that authorized the trial court to find that [Petitioner] was informed of his right to decide whether to testify and that the decision to testify was his and not his attorney's. In addition, the trial transcript reflects that in preliminary instructions to the jury given in the presence of the defendant immediately after the jurors were selected and sworn, the trial judge stated that "a defendant on trial may testify or not as he chooses." Furthermore, at the post-conviction hearing, one of [Petitioner's] attorneys testified he had represented [Petitioner] in a criminal prosecution in DeKalb County which had resulted in a directed verdict of acquittal prior to Fulton County's prosecution of [Petitioner], and to his practice as lead counsel of informing a defendant that it is his decision whether to testify at trial. At the hearing, [Petitioner] denied his DeKalb attorney had informed him of his right to decide whether to testify in the DeKalb proceeding.

*Id.* at 850 n.4.

## 2.     The Deadly Weapon Jury Instruction

The Supreme Court of Georgia concluded that the trial court's deadly weapon jury instruction was not erroneous, and it set forth the following findings and conclusions regarding the issues raised:

> During the jury instructions concerning the two counts charging [Petitioner] with aggravated assault with a deadly weapon, the trial court informed the jury that the crime is committed when the accused, with a deadly weapon, places another person in reasonable apprehension of immediately receiving a violent injury. The trial court then told the jury that "A pellet gun in the shape of an automatic weapon is per se a deadly weapon." The Court of Appeals ruled it was error to give the "per se"

12

charge, reasoning that a pellet gun is not a per se deadly weapon and it was for the jury to resolve whether the manner and means by which it was used made it a deadly weapon.

A firearm is a deadly weapon as a matter of law. A firearm pointed at a victim and reasonably appearing to the assault victim to be loaded is a deadly weapon as a matter of law, regardless of whether it is loaded and, under such a circumstance, the trial court does not err when it takes the issue of "deadliness" from the jury. A pellet gun is a deadly weapon per se when the uncontradicted evidence is that it reasonably appeared to the victim against whom it was used to be deadly. In the case at bar, each of the two victims testified that [Petitioner] pulled out a gun, pointed it at her and demanded she do as he said. Each victim testified she thought [Petitioner] was going to shoot her. One of the victims described [Petitioner's] weapon as looking like the Glock firearm carried by law enforcement officers. In light of the uncontradicted evidence that each victim perceived the weapon used by [Petitioner] to be a gun that could be used to shoot her, the trial court did not err when it informed the jury that the pellet gun was a deadly weapon per se. Accordingly, the Court of Appeals erred when it ruled that the issue of the deadliness of the weapon was for the jury.

*Id.* at 851 (citations omitted).

### D.   **On Remand, the Georgia Court of Appeals Denied Petitioner's Remaining Claim for Relief**

Upon remand, the Georgia Court of Appeals denied Petitioner relief on his remaining claim alleging that a petit juror, in response to the following question during voir dire, failed to disclose relevant information:

> Now, ladies and gentlemen, how many of you have been the victim of a crime or you've had a close family member

13

> or close friend the victim of a crime where you were very
> much involved or interested in what the outcome of their
> charges were? If any of you are in that category, tell me
> and this will be -- if you perceive it to have been a crime,
> then we want to know about it, okay?

The juror at issue stated, "My goddaughter [sic] was molested by my ex.
He's serving 20 years in State of Georgia now." After sentencing,
counsel spoke with members of the jury and learned that this juror had
been the victim of a rape and had not reported the crime and that she had
shared this experience with the jury during deliberations. The juror was
then sworn as a witness and testified that she thought she had revealed
during voir dire that she had been raped and she did not think that she
would get picked for the jury for that reason; that she had been raped by
her husband 20 years earlier but had not reported it because she did not
think it was rape; that she tearfully volunteered this information during
deliberations when the jury was discussing the fact that one of the
victims in the instant case did not immediately report the attack; that her
experience had no impact on the decision she made in the trial; that she
believed that she had been a fair and impartial juror and considered all
of the evidence; and that the jury had debated the case vigorously and
had decided the case based on the evidence.

> [I]n order for a defendant to secure a new trial because a juror did
> not give a correct response to a question posed on voir dire, the
> defendant must show that the juror failed to answer the question
> truthfully and that a correct response would have been a valid basis for
> a challenge for cause. Even if we assume that the juror did not answer
> the question  truthfully, we conclude that a new trial is not warranted
> because a correct response would not have been a valid basis for a
> challenge for cause.

> > Whether to strike a juror for cause lies within the sound
> > discretion of the trial court. For a juror to be excused for
> > cause, it must be shown that he or she holds an opinion of

14

the guilt or innocence of the defendant that is so fixed and definite that the juror will be unable to set the opinion aside and decide the case based upon the evidence and the court's charge upon the evidence.

During voir dire, the juror testified that she had no doubt that she could be fair and impartial in this case. She explained that she told her granddaughter to forgive her ex-husband and that she forgave him because she was a Christian. She further testified that "I never look at a person as being guilty. I always like to hear both sides of the evidence. . . . I like to listen to what people say before I decide on any decisions that I make." When asked if her religious beliefs would prevent her from determining guilt, she replied that it would not be difficult for her to make a decision. Accordingly, we conclude that [Petitioner] has not shown that a correct response to the question posed would have been a valid basis for a challenge for cause because in light of the juror's testimony, the trial judge would have been within its discretion had it refused to strike the juror for cause. Accordingly, this enumerated error fails, and we affirm [Petitioner's] convictions.

*Nejad v. State*, 700 S.E.2d 886, 887-88 (Ga. Ct. App. 2010) ("*Nejad III*") (footnotes and internal quotations omitted), *cert. denied*, No. S11C0163, 2011 Ga. LEXIS 106 (Ga.), *cert. denied*, 132 S. Ct. 101 (2011). After the United States Supreme Court denied Petitioner certiorari review, he did not seek further post-conviction relief in state court. (*See* Doc. 1 at 5).

**E.    Petitioner's Federal Habeas Petition**

In his federal habeas petition, Petitioner raises the following three grounds:

(1)    [He] did not exercise his constitutional right to testify at trial

15

because of ineffective assistance of trial counsel.

(2)   [T]he trial court unlawfully and fatally invaded the province of the jury when it inappropriately and wrongly instructed the jury that a pellet gun in the shape of a firearm is per se a deadly weapon, an essential element of the Bill of Indictment.

(3)   During voir dire, a venire juror did not truthfully disclose that she was a rape victim. A truthful response would have subjected said venire juror to be struck for cause. Instead, said venire juror became a petit juror and improperly revealed her prior rape to her fellow jurors during jury deliberations.

(Doc. 1 at 7, 10, 13-14).

## II.   Federal Habeas Review

A federal court may issue a writ of habeas corpus on behalf of a person held in custody pursuant to a judgment of a state court if that person is held in violation of his rights under federal law.  *See* 28 U.S.C. § 2254(a).  This power, however, is limited.

A federal court may not grant habeas corpus relief for claims previously decided on the merits by a state court unless the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State

16

court proceeding." 28 U.S.C. § 2254(d). A state court's determination of a factual issue is presumed correct unless the petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In *Williams v. Taylor*, 529 U.S. 362, 412 (2000), the Supreme Court explained that, in applying 28 U.S.C. § 2254(d), a federal habeas court first ascertains the "clearly established Federal law" based on "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." The federal habeas court then considers whether the state court decision is "contrary to" that clearly established federal law, i.e., whether the state court "applies a rule that contradicts the governing law set forth" in Supreme Court cases, or "confronts a set of facts that are materially indistinguishable from" those in a Supreme Court decision "and nevertheless arrives at a result different from" that decision. *Id.* at 405-06.

If the federal habeas court determines that the state court decision is not contrary to clearly established federal law, it then considers whether the decision is an "unreasonable application" of that law, i.e., whether "the state court identifies the correct governing legal principle" from the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different

17

from an *incorrect* application of federal law." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (internal quotations omitted). "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly [but r]ather, that application must also be unreasonable." *Williams*, 529 U.S. at 411. Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) ("Where [in a federal habeas corpus petition] the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable.").

This Court has reviewed the parties' filings, including the exhibits, and finds

that the record contains sufficient facts upon which the issues may properly be resolved.  As Petitioner has not made a showing sufficient under 28 U.S.C. § 2254(e) to warrant an evidentiary hearing, the case is now ready for disposition.

## III.   <u>Discussion</u>

### A.   <u>Petitioner Has Not Shown That He Was Prejudiced By Trial Counsel's Failure to Inform Him About His Right to Testify.</u>

In his first ground for relief, Petitioner claims trial counsel prevented him from testifying at his trial by not informing him that the decision whether or not to testify was his, and his alone, to make.  (Doc. 1 at 7-8).  Respondent asks this Court to defer to the conclusion of the Supreme Court of Georgia that although Petitioner's trial counsel did not inform him of his right to testify, the trial court made Petitioner aware of his right to testify and of his right to decide whether to testify, rendering harmless any deficient performance by counsel.  (Doc. 8-1 at 7-9).

Petitioner responds that the Supreme Court of Georgia's finding that the trial court informed Petitioner of his right to testify was an unreasonable determination of the record facts.  (Doc. 14 at 19 *et seq.* (Petr.'s Resp. to Answer at 17 *et seq.*)).[1]

---

[1]  Because Petitioner filed a title page and table of contents, the CM/ECF page numbers for Document 14 are two greater than the corresponding page numbers for Petitioner's Response to the Answer.  Additional citations to this document will only utilize the CM/ECF page numbers.

19

Petitioner notes that during the hearing on his motion for new trial, his trial counsel was asked "who made the ultimate decision on whether [Petitioner] testified or didn't testify" at Petitioner's trial.  (*Id.* at 23).   Trial counsel, who "rule[s his criminal defense clients] with an iron first," responded that "I really think in this case I made that ultimate decision.  I think it was obviously wrong of me, and I don't say that lightly, but it is something that I really feel like I made a mistake on in this case." (*Id.* at 21, 23-24).

Petitioner testified at the new-trial hearing that no one, including the trial judge, ever explained to him that the decision as to whether he would testify was his, not his attorney's.  (*Id.* at 26).  Petitioner testified at the hearing that his trial testimony would have revealed that his first alleged victim, Ms. Lankford, agreed to have intercourse with him for $200, but he declined to consummate their arrangement when he learned she was on her menstrual cycle, so he tossed her belongings out of his vehicle window and drove home, never to see her again. (*Id.* at 27-28).  Petitioner also testified at the hearing that at trial he would have denied threatening the other alleged victim, Ms. Hoy, and would have testified that he engaged solely in consensual sexual activity with her and then drove her to her hotel.  (*Id.* at 28-29). "Petitioner, as a well-spoken man with a pleasant demeanor, would have made a

20

powerful witness at trial. . . . However, solely because of deficient performance by Petitioner's trial counsel, the jury heard only the alleged victims' version of the supposed events without Petitioner being permitted to voice his defense." (*Id.* at 29).

Petitioner argues that the best evidence as to whether the trial judge informed him of his right to testify are the trial judge's own notes and the certified trial transcript, neither of which contains a reference to such a colloquy. (*Id.* at 30-31). Despite this evidence, Petitioner argues, Judge Baxter, who did not preside over Petitioner's trial, "blatantly erroneously conclude[d] that Petitioner's trial counsel could not positively swear that the trial [j]udge . . . did not inform Petitioner that the ultimate decision to testify or not was his, and not his attorney's." (*Id.* at 32).

Petitioner notes that his trial counsel swore under oath to precisely the opposite—that the trial judge did not inform Petitioner of his right to testify. (*Id.*). Petitioner argues that the trial record reveals—contrary to the prosecutor's "fantasy" about an off-the-record colloquy in open court on the matter at issue—that no such colloquy took place or even would have been possible during the time the prosecutor claims she remembers it having occurred, i.e., during a lunch break at the very end of the evidentiary portion of the trial. (*Id.* at 36). Petitioner argues that this alleged colloquy is nothing more than a "fable" concocted by the prosecutor, as revealed by

21

the lack of any other participant's similar recollection and by the lack of any reference to it in the certified trial transcript or in the trial judge's notes. (*Id.* at 32-36 & n.5).

The United States Supreme Court set forth the standard for evaluating claims of ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). "An ineffectiveness claim . . . is an attack on the fundamental fairness of the proceeding whose result is challenged." *Id.* at 697. The analysis involves two components, but a court need not address both if the petitioner "makes an insufficient showing on one." *Id.* First, a federal habeas court determines "whether, in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. The court "must be highly deferential" in scrutinizing counsel's performance and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In other words, the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (Internal quotations omitted). "Given the strong presumption in favor of competence, the petitioner's burden of persuasion—though the presumption is not insurmountable—is a heavy one." *Chandler v. United States*,

218 F.3d 1305, 1314 (11th Cir. 2000) (en banc).  Second, a federal habeas court

determines whether counsel's challenged acts or omissions prejudiced the petitioner,

i.e., whether "there is a reasonable probability"—one "sufficient to undermine

confidence in the outcome"—that "but for counsel's unprofessional errors, the result

of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The Supreme Court more recently explained the difficult challenge facing a

state prisoner who has raised an ineffective assistance of counsel claim:

> Surmounting *Strickland*'s high bar is never an easy task. An
> ineffective-assistance claim can function as a way to escape rules of
> waiver and forfeiture and raise issues not presented at trial, and so the
> *Strickland* standard must be applied with scrupulous care, lest intrusive
> post-trial inquiry threaten the integrity of the very adversary process the
> right to counsel is meant to serve.  Even under *de novo* review, the
> standard for judging counsel's representation is a most deferential one.
> Unlike a later reviewing court, the attorney observed the relevant
> proceedings, knew of materials outside the record, and interacted with
> the client, with opposing counsel, and with the judge. It is all too
> tempting to second-guess counsel's assistance after conviction or
> adverse sentence. The question is whether an attorney's representation
> amounted to incompetence under prevailing professional norms, not
> whether it deviated from best practices or most common custom.

> Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult. The standards
> created by *Strickland* and § 2254(d) are both highly deferential, and
> when the two apply in tandem, review is doubly so. The *Strickland*
> standard is a general one, so the range of reasonable applications is
> substantial. Federal habeas courts must guard against the danger of

23

> equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 131 S. Ct. at 788 (citations and internal quotations omitted).

"[A] criminal defendant has a *fundamental* constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel." *Nichols v. Butler*, 953 F.2d 1550, 1552 (11th Cir. 1992) (*en banc*). "[I]t is primarily the responsibility of defense counsel to ensure that the defendant's right to testify is protected by advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and *that it is ultimately for the defendant himself to decide*." *Id.* at 1553 (emphasis added) (internal quotations omitted). "Absent such advice, the defendant cannot effectively waive his right to testify." *McGriff v. Dep't of Corr.*, 338 F.3d 1231, 1237 (11th Cir. 2003) ("Counsel must advise the defendant (1) of his right to testify or not testify; (2) of the strategic implications of each choice; and (3) that it is ultimately for the defendant himself to decide whether to testify." (citing *United States v. Teague*, 953 F.2d 1525, 1533 (11th Cir. 1992) (*en banc*))). Here, it appears none of Petitioner's three defense attorneys satisfied this obligation. *See Gallego v.*

24

*United States*, 174 F.3d 1196, 1197 (11th Cir. 1999) ("Where counsel has refused to accept the defendant's decision to testify and refused to call him to the stand, or where defense counsel never informed the defendant of his right to testify and that the final decision belongs to the defendant alone, defense counsel has not acted within the range of competence demanded of attorney[]s in criminal cases, and the defendant clearly has not received reasonably effective assistance of counsel." (internal quotations omitted)).   Thus, the performance of Petitioner's trial counsel was deficient under the Sixth Amendment.

Nevertheless, to prevail on his ineffective-assistance claim, Petitioner also must demonstrate prejudice. *See, e.g.*, *Morris v. Sec'y Dep't of Corr.*, 677 F.3d 1117, 1129 (11th Cir. 2012) (concluding that petitioner's claim "that his trial counsel was ineffective for failing to advise him of his right to testify during the penalty phase" of his trial failed because petitioner "has not established that the Florida Supreme Court's prejudice determination was an unreasonable application of *Strickland*"; and following the Florida Supreme Court's approach, whereby it "did not determine whether there was deficient performance, and instead went straight to the prejudice prong and concluded that [petitioner] had failed to meet his burden of establishing prejudice"). In *Parks v. Sec'y, Dep't of Corr.*, 6:09-cv-1817-Orl-36GJK, 2012 U.S.

AO 72A
(Rev.8/82)

Dist. LEXIS 151358, at *14-18 (M.D. Fla. Oct. 22, 2012), the court denied petitioner's ineffective-assistance claim based on counsel's alleged failure to advise him of his right to testify because the plea colloquy between petitioner and the trial court, on the record, obviated any potential prejudice arising from counsel's actions.

Moreover, courts have declined to find prejudice arising from counsel's improper advice to a defendant regarding his right to testify when his testimony would have been unlikely to change the outcome of the proceeding. *See, e.g.*, *Morris*, 677 F.3d at 1130 (concluding that petitioner "has not demonstrated a reasonable probability that his sentence would have been different had he testified during the penalty phase of the trial, much less that the Florida Supreme Court's contrary conclusion was an unreasonable one"); *Fishbone v. Sec'y for the Dep't of Corr.*, 165 Fed. Appx. 800, 801-02 (11th Cir. 2006) (concluding that petitioner failed to establish prejudice arising from his counsel's performance, which allegedly deprived him of his right to testify at his trial, "[b]ecause [his] proposed testimony conflicted with that of two medical experts and would have exposed [him] to damaging impeachment evidence, [and thus] no reasonable possibility exists that the result of the proceedings would have differed if [he] had testified").

Here, of course, no colloquy between Petitioner and the trial court regarding

26

Petitioner's right to testify was memorialized on the record or in the trial court's notes. However, the new-trial court found as fact that the colloquy did take place, and the Supreme Court of Georgia declined to question that finding, concluding that the new-trial court's finding had in effect amended the trial transcript to include a colloquy on the matter. Moreover, there are suggestions in the record that there would have been significant perils in Petitioner's taking the stand, making it unlikely that his testimony would have altered the outcome of his trial. For example, Petitioner's lead counsel testified at the new-trial hearing, "But, you know, there was another [similar] case [against Petitioner] potentially pending here in Fulton County. Second indictment with two other similar transactions that hadn't been indicted yet, and there was a case pending in Henry County that we knew about. There was another similar transaction." (Doc. 12-2 at 42). In that regard, the trial court asked counsel, "A bunch of similar transactions; is that right? That he would be questioned [about]? . . . [That] he would have to explain away?" (*Id.* at 45). Counsel responded, "There would be a number of those issues, and to me once we had gone through everything and I prepped him for it, the pluses and the minuses didn't work out, in my opinion." (*Id.*). The prosecutor also noted, with respect to her potential cross-examination of Petitioner:

27

> We have DNA in three different locations. We have a number of
> similar transactions. We have three different women who don't know
> each other saying he pulled a gun. They all could describe the gun. So
> what is he going to say? How is he going to explain this if he takes
> the stand?

(*Id.* at 87).[2]

Based on the foregoing, it appears that Petitioner was not prejudiced by his

counsel's deficient performance because the trial court informed him of his right to

testify and because it is unlikely that the outcome of his trial would have been

different had he testified.  In any event, Petitioner has not made the showing

necessary to prevail under the doubly deferential standard that applies to a claim of

ineffective assistance of counsel in a habeas corpus proceeding.  He has not shown,

in short, that "there is [no] reasonable argument that counsel satisfied *Strickland*'s

---

[2] In addition, the prosecutor explained why it was that she had such a clear memory of the plea colloquy between Petitioner and the trial court.  The vividness of her memory derived from her anxiety at the prospect of cross-examining Petitioner, which would have been her first opportunity to cross-examine a defendant in a rape trial. (Doc. 12-2 at 87-90).  She also testified that Mr. Joshi, one of Petitioner's defense attorneys, told her "a couple months" before the hearing that "he did remember [the plea colloquy] happening," and he remembered, as did the prosecutor, Petitioner "standing up" and "the judge telling him what his rights were and [his] saying no and sitting down." (*Id.* at 89-90).  On cross-examination at the new-trial hearing, however, Mr. Joshi denied having made these statements to the prosecutor "because [he] had already looked at the transcript." (*Id.* at 31).  Mr. Trost, another of Petitioner's defense attorneys, testified at the hearing that he "originally thought that [the colloquy] had" occurred, but he "attribute[d] that to the practice and procedure" that both trial court and prosecutor would normally follow. (*Id.* at 12).  Ultimately, he testified that he could not say that the colloquy did not happen, but he did not remember that it did, either. (*Id.* at 11-13).

deferential standard," which standard includes the showing he must make regarding

prejudice arising from his counsel's deficient performance.  *See Richter*, 131 S. Ct.

at 788.  Petitioner's first ground for relief fails.

**B.    Petitioner Has Not Shown Prejudice From The Deadly Weapon Jury Instruction.**

The trial court instructed the jury at Petitioner's trial as follows:

> Now, ladies and gentlemen, I'm going to define aggravated assault with a deadly weapon. This applies to Count 3 which alleges to involve Linda Lankford and Count 5 which alleges to involve Melissa Hoy. The definition is the same, and I'm going to give you the definition this one time.
>
> An assault is an act which places another person in reasonable apprehension of immediately receiving a violent injury.
>
> A person commits the offense of aggravated assault when that person assaults another person with a deadly weapon.
>
> To constitute such an assault, actual injury to the alleged victim need not be shown.
>
> The state must also prove as a material element of aggravated assault, as alleged in this case, that the assault was made with a deadly weapon.
>
> A pellet gun in the shape of an automatic weapon is *per se* a deadly weapon.

(Doc. 11-7 at 147).

29

Petitioner notes that under Georgia law, as set forth above, a conviction for aggravated assault with a deadly weapon requires proof of only two elements—that the defendant (1) used a deadly weapon (2) to put the victim in reasonable apprehension of immediately receiving a violent injury.   (Doc. 14 at 41-42). Petitioner argues that when the trial court instructed the jury that a pellet gun is *per se* a deadly weapon, it "unilaterally and unlawfully usurped the jury's fact-finding duty regarding an essential element of the Aggravated Assault with a Deadly Weapon counts.  Petitioner's trial court thereby violated Petitioner's Constitutional rights as explained below."  (*Id.* at 44).

Petitioner notes that the United States Constitution requires " 'criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt' " (*id.* (citing *United States v. Gaudin*, 515 U.S. 506, 509-10 (1995); *Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993)), a requirement that applies to the states via the Fourteenth Amendment (*id.* at 45).  Petitioner notes further that "this right prevents a trial court from instructing the petit jury in a manner that relieves the prosecution of its burden of proving beyond a reasonable doubt any essential element of the offense"; that no element of a charged offense "may be presumed to exist or to *per se* exist"; and that

30

the state " 'may not shift the burden of proof to the defendant by presuming [an element of the offense] upon proof of the other elements.' " (*Id.* (citing *Sullivan*, 508 U.S. at 277-81; *Francis v. Franklin*, 471 U.S. 307, 314 (1985); *Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979); and *Patterson v. New York*, 432 U.S. 197, 215 (1977))).

Petitioner argues that the Supreme Court of Georgia violated these principles when it upheld their inconsistent application by the trial court, which, after "conceding that the use of a deadly weapon was a crucial element of the offenses that had to be proven by the prosecution beyond a reasonable doubt[,] . . . then determin[ed that] the evidence to support that critical element was satisfied as a matter of law." (*Id.* at 45-46). Petitioner argues that the trial court's unconstitutional jury instruction was not redeemed by the jury instructions as a whole or by a specific contradictory instruction (*id.* at 46-47), and also argues that an error of this magnitude cannot be deemed harmless (*id.* at 47-48).

Petitioner attempts to distinguish in this regard the Supreme Court's holding in *Neder v. United States*, 527 U.S. 1 (1999), by arguing that the ambiguous testimony of the two alleged victims demonstrates that, unlike the situation in *Neder*, " 'the record contains evidence that could rationally lead to a contrary finding with

31

respect to the omitted element.' "[3]   (*Id.* at 48 (quoting *Neder*, 527 U.S. at 18)).

Petitioner argues that, in ruling that "the uncontradicted evidence is that [the pellet

gun] reasonably appeared to the victim[s] against whom it was used to be deadly," the

Supreme Court of Georgia "not only ignored Georgia authority that holds that the

deadliness of a weapon other than a firearm is a jury question, but also did not

address the Constitutional implications of its reasoning."   (*Id.* at 50 (internal

quotations omitted)).   Petitioner argues that the trial court's instruction, which took

from the jury's determination an essential element of two of his crimes of conviction,

was just as impermissible as it would have been for the trial court to direct a verdict

for the prosecution on those two charged crimes.   (*Id.* at 50-51).

Petitioner next argues that *all* of his convictions must be set aside based on the

erroneous jury instruction on aggravated assault because either "force" or "lack of

consent" is an essential element of each of his remaining convictions.   (*Id.* at 52).   He

argues that it is clear from the course of the trial, including the prosecutor's closing

argument, that these elements of force derived solely from the presence of the

_____

[3] Petitioner contends that Lankford failed to mention the gun to the police and that Hoy not only believed and acted as if she were in no danger, failing to run away from Petitioner when she had the opportunity, but she also proceeded to service her next prostitution client a short while later without reporting her allegedly life-threatening encounter with Petitioner to the police.   (Doc. 14 at 48-49).

"supposed gun that Petitioner's trial court wrongly proclaimed and declared was a 'deadly weapon *per se*.' " (*Id.* at 52 *et seq.*; *see id.* at 56 (noting that "the prosecutor's closing argument exclaimed to the petit jury . . . that this 'deadly weapon' caused each alleged victim not to consent to the indicted sexual acts[, which she was] . . . forced to perform")). "In essence, the trial court instructed the petit jury that any argument that the victims consented or were not 'forced' was implausible in light of the presence of a *per se* deadly weapon. To this extent, the trial court deprived Petitioner of the meaningful opportunity to argue to the petit jury that there was no force and that the victims, who were prostitutes, actually consented to these sexual acts." (*Id.* at 54).

Respondent notes in response that the Supreme Court of Georgia concluded that the jury instruction at issue was appropriate based on its review of the victims' trial testimony, which revealed that each victim "said that Petitioner 'pulled out a gun, pointed it at her and demanded that she do as he said,' . . . that each thought Petitioner 'was going to shoot her,' and that one victim described the weapon as looking like 'a Glock firearm carried by law enforcement officers.' " (Doc. 8-1 at 13-14).

"[I]mproper jury instructions can never be the basis for federal habeas corpus

relief unless the instruction rendered the whole trial so unfair as to amount to a denial of due process." *Jones v. Dugger*, 888 F.2d 1340, 1343 (11th Cir. 1989); *see Womack v. United States*, No. 11-285-WS, 2012 U.S. Dist. LEXIS 111326, at *20 (S.D. Ala. June 6) (same), *adopted by* 2012 U.S. Dist. LEXIS 111328 (S.D. Ala. Aug. 8, 2012). "[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (stating that "[t]he only question for us is whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," and "[i]t must be established not merely that the instruction is undesirable, erroneous, or even universally condemned, but that it violated some [constitutional] right" (internal quotations omitted)).

Moreover, as for most alleged constitutional errors in the trial process, "a federal court reviewing a state-court determination in a habeas corpus proceeding ordinarily should apply the 'harmless error' standard, . . . namely, whether the error had substantial and injurious effect or influence in determining the jury's verdict." *California v. Roy*, 519 U.S. 2, 4-6 (1996) (remanding for consideration of whether "an error in the [jury] instruction that defined the crime" was harmless according to the standard set forth above) (citation and internal quotations omitted); *see also*

AO 72A
(Rev.8/82)

*Neder*, 527 U.S. at 9 (noting that a jury "instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence"); *Fordham v. United States*, 706 F.3d 1345, 2013 U.S. App. LEXIS 2281, at *7 n.3 (11th Cir. 2013) ("In the habeas context, . . . the government . . . is given the opportunity to prove [that a jury instruction] error was harmless by showing the error did not have a substantial and injurious effect or influence in determining the jury's verdict." (internal quotations omitted)).

To determine whether the trial court's jury instruction regarding Petitioner's pellet gun had a substantial and injurious effect or influence on the jury's verdict, it is necessary to review the trial testimony of the two victims with regard to that weapon. Lankford, the first victim, testified that Petitioner drove her to a secluded spot, pulled out a gun, pointed it at her face, and told her, "Bitch, get naked." (Doc. 10-11 at 39-40). Petitioner then instructed Lankford, at gun point, to get in the back of his vehicle and "to come over there and give him some head." (*Id.* at 42). She objected, but he told her to shut up and do as he said. (*Id.*). The gun "was pointed at the back of [her] head while [she] was giving him head." (*Id.*). Lankford testified that she thought that Petitioner "was going to kill [her]" (*id.* at 43); that while she was

35

having intercourse with Petitioner, the gun was pointed at her face (*id.* at 45 ("He like basically was laying on top of me with one arm holding himself up with the other hand pointing the gun at my face.")); and that she "thought he was going to shoot [her] while [she] was getting out [of his vehicle] or while he was pulling out or something" (*id.* at 49).

Hoy, the second victim, an admitted prostitute (Doc. 11-1 at 37), testified, "I was picked up in a car by a gentleman [i.e., Petitioner], and . . . he offered me $150 [for sex]. He then took me to a deserted spot and pulled a gun on me and held me for two and a half hours." (*Id.* at 39; *see id.* at 40 (Hoy's in-court identification of Petitioner); *id.* at 43 ("He went to the back of the vehicle, pulled out another backpack. Came back -- he stepped out to urinate and then came back, and that's when he had the gun with him. That's when he pulled a gun on me and told me to do as he said.")). Hoy testified that Petitioner pointed the gun at her (*id.* at 44); that she had an opportunity to "run away" when Petitioner went to urinate, but she stayed "[b]ecause there was no gun pointed at [her] at that time," and "[i]t was a job" (*id.* at 48); and that she "thought [Petitioner] was going to shoot [her] in the head." (*Id.* at 50). Hoy testified that she did not report the incident to the police because she was "a whore" who "would be the bad guy." (*Id.* at 54). She also testified that she never

36

consented to allow Petitioner to digitally penetrate her.  (*Id.* at 59).

On cross-examination, Hoy testified that when she first saw Petitioner's gun she "thought maybe this is part of his game." (*Id.* at 71-72).  Later, when asked if she was upset about the fact that Petitioner had failed to pay her, she testified, "I was upset that the gun was involved.  That's what upset me, not the money.  The gun." (*Id.* at 79).  Hoy testified on redirect examination that she did not feel she could leave "after the gun was pulled on" her.  (Doc. 11-1 at 151).  Each victim described Petitioner's gun as similar to the guns that policeman wear.  (*Id.* at 142 (" 'It was black, boxy, and square like.  It is similar to the one you are wearing.' " (quoting from Hoy's "Question and Answer Session conducted by Detective Tyus" (*id.* at 138-39))); *see* Doc. 10-11 at 57 ("It was a black gun. . . . I would say it resembled one of [those] police guns that are black." (Lankford's testimony))).

Under Georgia's aggravated assault statute, O.C.G.A. § 16-5-21, the determination as to whether or not the defendant used a deadly weapon is to be made from the perspective of the victim.  *See, e.g.*, *Adsitt v. State*, 282 S.E.2d 305, 308 (Ga. 1981) (stating that "*if it reasonably appears to the assault victim* that the firearm is or might be loaded then the assailant should be held to the consequences of using a deadly weapon whether or not the weapon in fact is loaded" (emphasis added)).  On

37

that basis, the Georgia appellate courts have approved the practice by the Georgia trial courts of instructing the jury that an instrumentality that appears to the victim of an assault to be a dangerous firearm is a deadly weapon *per se*. *See id.* at 307-08 (concluding that "an unloaded shotgun which is intentionally pointed at another in a threatening manner, rather than being used as a bludgeon or club, can be a 'deadly weapon' within the meaning of the aggravated assault statute," and holding that a shotgun used in that manner "is a 'deadly weapon' as a matter of law within the meaning of [Georgia's] aggravated assault statute"); *see also Clark v. State*, 381 S.E.2d 763, 765 (Ga. Ct. App. 1989) (affirming trial court's refusal to give jury instruction on simple assault and "find[ing] that the [pellet] gun in this case, in the way it was used as established by uncontradicted evidence, was per se a deadly weapon" (internal quotations omitted)).

Petitioner argues that the trial court, by giving the deadly weapon *per se* jury instruction, violated his constitutional right to a jury verdict beyond a reasonable doubt on every element of the crime of aggravated assault with a deadly weapon, thereby removing from the jury's purview the determination of one of the two elements of that crime. The undersigned concludes, however, based on the testimony of the two victims, that the jury instruction at issue was harmless, i.e., that it did not

38

have a "substantial and injurious effect or influence in determining the jury's verdict." *See Roy*, 519 U.S. at 4-6; *see also Neder*, 527 U.S. at 9. Each victim testified that Petitioner's pellet gun appeared to be a real weapon, similar to the kind that the police often carry, and each testified that Petitioner used the gun to threaten her and to coerce at least part of her cooperation with him, out of fear that he would kill her with the gun. Their testimony was challenged aggressively by defense counsel, but remained essentially uncontroverted. That testimony was sufficient to support a reasonable jury's verdict beyond a reasonable doubt that Petitioner assaulted each victim with a deadly weapon. Accordingly, Petitioner's second ground for federal habeas relief also fails.

### C.   Petitioner Has Not Shown His Trial Was Fundamentally Unfair Because A Venire Juror Failed To Disclose A Prior Rape.

Lastly, Petitioner argues that his constitutional right to a fair trial under the Sixth and Fourteenth Amendments was violated when a venire juror, Fawn Ferrell, failed to disclose during voir dire that her ex-husband had raped her, which would have subjected her to a strike for cause; Ferrell was selected for the petit jury; and then revealed her prior rape to her fellow jurors during jury deliberations in a manner that affected the outcome of the trial. (Doc. 14 at 58 *et seq.*). As noted above, during

39

voir dire, the trial court asked the venire jurors the following question:

> How many of you have been the victim of a crime or you've had a
> close family member or close friend the victim of a crime where you
> were very much involved or interested in what the outcome of their
> charges were? If any of you are in that category, tell me and this will
> be – If you perceive it to have been a crime, then we want to know
> about it, okay?

(*Id.* at 59 (formatting altered) (quoting Doc. 10-4 at 121-22)).  Ferrell, prospective

juror number 37, responded to this question by mentioning only that her ex-husband

had molested her "goddaughter" and that he was serving a term in prison for that

crime.  (*Id.* (citing Doc. 10-4 at 124; *see id.* at 132, 141; Doc. 10-7 at 70 *et seq.*)).[4]

After Petitioner was sentenced, Ferrell revealed that her ex-husband had raped

her and mentioned that it was for that reason that she was surprised that she had been

selected for the jury.  (Doc. 14 at 60).  She was sworn and testified as follows:

> I was raped by my – then he was my husband. I was raped by him. I

---

[4]  When asked if she could "remain fair and impartial" if selected for the petit jury, Ferrell
replied:
> Yes.  Because I never look at a person as being guilty. I always like
> to hear both sides of the evidence.  And one thing my mom always
> taught me and a lot of things I do hear by working in the court
> because we are sworn in when we are hired in the court, . . .
> everyone is always innocent until proven guilty without a shadow of
> a doubt.  You've got to have the evidence.  And I'm the type of -- I
> always listen. I like to listen to what people have to say before I
> decide on any decisions that I make.

(Doc. 10-7 at 75-76).

AO 72A
(Rev.8/82)

> never did report it because by me thinking being his wife, it didn't
> seem to be rape. I didn't think they would consider it being rape by
> me being his wife, so I never really talked about it too much but
> besides my family and a few friends.

(Doc. 11-9 at 86-87).  She testified that she started crying during the discussion of

Lankford's rape allegations and then volunteered the foregoing information to her

fellow jurors.  She also testified that although she herself and all of her fellow jurors

were surprised that she had been chosen for the jury in light of that revelation, which

she remembered that she had made during voir dire, the jury "really debated back and

forth about this case," and she herself had been "a fair and impartial juror and [had]

considered all the evidence."  (*Id.* at 87-89).

Petitioner argues that Ferrell's explanation to her fellow jurors about why a

rape victim might delay reporting the rape "was critical to the case at bar since there

was evidence presented that Ms. Hoy delayed reporting the indicted offenses as did

supposed similar transaction witnesses Ms. Johnson and Ms. Peterson."  (Doc. 14 at

64).  At the new-trial hearing, one of Petitioner's attorneys explained why the defense

team would have struck Ferrell from the jury had she revealed her prior rape.  He also

noted that "Ferrell's explanation to me [was that] she used her personal experience

to explain to the other jurors why delayed reporting doesn't mean a person wasn't

41

raped." (Doc. 12-2 at 27-29). Petitioner summarizes his argument for relief on his

third federal habeas ground as follows:

> [T]his juror's failure to respond truthfully during voir dire, coupled
> with her admitted actions during jury deliberations, to wit: (i) crying
> about her own rape while, (ii) explaining to her fellow jury members
> why a true victim of rape would not report same to the police, and
> (iii) contemplating why the trial court permitted her to sit on
> Petitioner's jury, constituted legal cause for removal. Therefore, the
> juror's own declaration that she was able to be fair and impartial was
> not persuasive, as bias was already evident. This is a situation where
> this juror became an unsworn witness against Petitioner, i.e.
> explaining from personal experience why the alleged victim would
> not come forward and report a rape to the authorities. This type of
> extra-judicial information that was used while crying to sway the
> other jurors with this information contributed to the verdict. Hence,
> this irregular conduct by the juror prejudiced Petitioner and rendered
> Petitioner's trial fundamentally and Constitutionally unfair.

(Doc. 14 at 64-65 (citations omitted)). Respondent contends that Petitioner has failed

to set forth a viable federal constitutional claim in ground three of his petition. (Doc.

8-1 at 15-17).

The Sixth Amendment to the United States Constitution, as applied to the states

through the Fourteenth Amendment, guarantees a defendant in a criminal trial "an

impartial jury." U.S. CONST. amend. VI; *see* U.S. CONST. amend. XIV § 1. "The

Constitution presupposes that a jury selected from a fair cross section of the

community is impartial, regardless of the mix of individual viewpoints actually

represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Ross v. Okla.*, 487 U.S. 81, 86 (1988) (internal quotations omitted) (formatting altered).

Petitioner has provided the Court with no federal law, clearly established by the United States Supreme Court or otherwise, to support his argument that the selection of Ferrell for the petit jury at his trial violated his Sixth Amendment right to an impartial jury selected from a fair cross section of the community. (*See* Doc. 14 at 58-65, citing not a single federal or state case other than the Georgia Court of Appeals' decision denying Petitioner's ground three claim). The Court notes, however, that the Supreme Court has held consistently that where no "member of [a defendant's] jury was removable for cause," his "jury was impartial for Sixth Amendment purposes." *Rivera v. Illinois*, 556 U.S. 148, 158-59 (2009) (noting that in *Ross*, 487 U.S. at 86-91, "because no member of the jury as finally composed was removable for cause, [the Court] found no violation of [the defendant's] Sixth Amendment right to an impartial jury or his Fourteenth Amendment right to due process," and that in *United States v. Martinez-Salazar*, 528 U.S. 304, 307, 317 (2000), the Court concluded that if a defendant was convicted "by a jury on which no biased juror sat, [he] could not tenably assert any violation of his . . . right to due

43

process" (internal quotations omitted)); *see Nejad III*, 700 S.E.2d at 888

("conclud[ing] that [Petitioner] has not shown that a correct response [from Ferrell]

to the question posed [regarding her victimization history] would have been a valid

basis for a challenge for cause because in light of the juror's testimony, the trial judge

would have been within its discretion had it refused to strike the juror for cause").

"So long as the jury that sits is impartial, . . . the Sixth Amendment was [not]

violated." *Ross*, 487 U.S. at 88.

The gravamen of Petitioner's argument is that his attorneys would have used

a peremptory strike against Ferrell had they known the full truth about her past

victimization and that subsequent events establish that her selection to the petit jury

was a mistake.[5]  Petitioner has not presented any evidence, however, that Ferrell or

any other petit juror was biased against him, much less evidence that a juror was so

biased as to be removable for cause because the juror would be, or was, unable to

"conscientiously and properly carry out [his or her] sworn duty to apply the law to the

facts" of Petitioner's case. *See Ross*, 487 U.S. at 86.  In short, Petitioner has not

---

[5] Petitioner does mention in his petition, although almost in passing, that a truthful response from Ferrell "would have been a valid basis for a challenge for cause[,] as all other venire jurors who were closely related to rape victims were struck for cause." (Doc. 1 at 15).  However, he has failed to develop that argument elsewhere in his pleadings before this Court or to point to evidence in the record to support his contention about the other venire jurors.

44

"show[n] that the state court's ruling on . . . [his ground three claim] was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Richter*, 131 S. Ct. at 786-87.  Therefore, Petitioner's third and final ground for relief also fails.

**IV.    Certificate of Appealability**

A state prisoner must obtain a certificate of appealability (COA) before appealing the denial of his federal habeas petition.  28 U.S.C. § 2253(c)(1)(A).  A COA may issue only when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotations omitted).  A petitioner need not "show he will ultimately succeed on appeal" because "[t]he question is the debatability of the underlying constitutional claim, not the resolution of that debate." *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 934 (11th Cir. 2009) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 337, 342 (2003)).

When the district court denies a habeas petition on procedural

45

> grounds without reaching the prisoner's underlying constitutional claim, . . . a certificate of appealability should issue only when the prisoner shows both that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Jimenez v. Quarterman*, 555 U.S. 113, 118 n.3 (2009) (quotations omitted). Because, as the procedural history of this case reveals, the viability of Petitioner's first two grounds for relief are debatable by jurists of reason, the undersigned **RECOMMENDS** that Petitioner be **GRANTED** a certificate of appealability on the following two issues:

(1)    Did trial counsel's failure to inform Petitioner of his right to testify violate Petitioner's Sixth Amendment right to the effective assistance of counsel, as guaranteed by the Fourteenth Amendment's due process clause?

(2)    Did the trial court's jury instruction on the presence of a deadly weapon *per se* violate the Fourteenth Amendment's requirement that the State prove every element of a criminal offense beyond a reasonable doubt?

## V.    Conclusion

For the foregoing reasons, **IT IS RECOMMENDED** that the Court **DENY** Petitioner's petition for a writ of habeas corpus (Doc. 1), **DISMISS** this action, and **GRANT** Petitioner a certificate of appealability on the two issues noted above.

Petitioner's motion for leave to file his response to Respondent's answer (Doc.

13) is **GRANTED** *nunc pro tunc*.

The Clerk is **DIRECTED** to terminate the referral to the Magistrate Judge.

**SO RECOMMENDED, ORDERED and DIRECTED** this  28th  day of

 March , 2013.

                              /s/ *J. CLAY FULLER*
                              J. CLAY FULLER
                              United States Magistrate Judge

47