IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ALI NEJAD
GDC #0001206892; Macon State
Prison,

   Petitioner,

     v.

GREGORY MCLAUGHLIN, Warden,

   Respondent.

CIVIL ACTION FILE
NO. 1:12-CV-1502-TWT

## OPINION AND ORDER

**"Something is rotten in the state of Denmark."**

– William Shakespeare, *Hamlet*, Act I, Scene 4.

This is a habeas corpus action. It is before the Court on the Report and Recommendation [Doc. 15] of the Magistrate Judge recommending denying the Petition. For the reasons set forth below, I decline to adopt in its entirety the Report and Recommendation and grant the Petition for a Writ of Habeas Corpus.

## I. Background

In December 2005, a Fulton County jury convicted Ali Nejad of rape, aggravated sodomy, aggravated assault with a deadly weapon (two counts), and aggravated battery (two counts). He was sentenced to 35 years in prison. In a motion for new trial, Nejad asserted three claims: (1) the trial court erroneously charged the jury that a pellet gun was per se a deadly weapon; (2) a juror failed to disclose that she was a rape victim; and (3) trial counsel was ineffective. The Defendant moved to recuse the trial judge, the Honorable T. Jackson Bedford, Jr., on the grounds that a letter written by the judge to the Superior Courts Sentence Review Panel demonstrated bias and prejudice against the Defendant.[1] Judge Bedford granted the motion to recuse.[2] The motion for new trial was then denied by the Honorable Jerry W. Baxter. On direct appeal, the Defendant raised the same three claims.

After noting that on appeal the evidence is construed in favor of the verdict, the Georgia Court of Appeals summarized the facts of the case as follows:

> So viewed, the record shows that there were two alleged victims of the crimes for which Nejad was tried, Linda Lankford and Melissa Hoy. Lankford testified that on May 11, 2004, she was talking to Nejad at a gas station, and he offered her a ride to the hotel where she was staying.

---

[1]     Motion to Recuse [Doc. 9-6, at 74-80].

[2]     Order of Recusal [Doc. 9-25, at 52].

Lankford recalled that Nejad was driving a SUV and that there was a baby car seat in the back of the vehicle. During the ride, Nejad offered her $200 in exchange for sex or an agreement to masturbate him, and Lankford refused, telling Nejad that she was not a prostitute. Lankford recalled that they also talked about smoking marijuana and that Nejad told her that he and his friends smoked behind a building where he worked. After purchasing baby wipes from a grocery store, Nejad drove Lankford to a secluded area where he parked the SUV near a factory, which Lankford assumed was Nejad's place of employment. Nejad then pointed a gun at Lankford, demanded that she take off her clothes and put on pantyhose with a hole in the crotch area, and made her perform oral sex on him, while pointing the gun at the back of her head. Nejad also had intercourse with Lankford after ordering her to remove a tampon from her body. Nejad then ejaculated on Lankford's stomach and gave her a baby wipe to clean up. Lankford recalled that the gun was pointed at her face while they had intercourse. When they were done, Nejad ordered Lankford to exit his vehicle, naked with her clothes in her hand. Lankford dressed herself with the clothes that she could find and then ran to a nearby building where she banged on the door and told the people inside to call the police because she had been raped. David Vance, a supervisor at the building, testified that Lankford was pounding on the door and was hysterical as she screamed and hollered that she had been raped. Detective Lisa Roey of the Atlanta Police Department testified that she responded to the scene and interviewed Lankford. Lankford told her that she agreed to accept $200 from Nejad to watch him masturbate because she needed the money as she was new to Atlanta. When Roey went to the scene of the crime, she found Lankford's identification, hotel room key, pictures of Lankford's children, a tampon, and some baby wipes.

Melissa Hoy testified that she was a prostitute and that she voluntarily entered Nejad's white SUV on June 5, 2004, after Nejad offered her $150 to perform sexual acts. Nejad gave her thigh-high nylon stockings to wear and drove to a secluded area. Hoy further testified that once Nejad stopped the vehicle, he took a backpack and a black gun from the back of the vehicle, which was later determined to be a plastic pellet gun, put the baby car seat into the back of the vehicle, and told Hoy to get into the back seat. Nejad urinated and then got into the back seat with Hoy.

When asked why she did not run away, Hoy testified that she could have but that it "was a job." Nejad fondled and digitally penetrated Hoy's anus and vagina while holding the gun, then put the gun down while he masturbated. Over two hours later, Nejad ejaculated, using Hoy's clothing to clean up the semen. Nejad gave Hoy her clothes and told her to exit the vehicle and said he would leave $100 on the concrete at the end of the street. Hoy never looked for the money. Instead, she dressed herself then walked to a nearby restaurant where she called a client, who picked her up and with whom she had sex in exchange for money. Weeks later, Hoy spoke to another prostitute to warn her about the driver of the white SUV, and that person advised that she already knew about him.

At trial, Nejad stipulated that the semen from Hoy's shirt contained his DNA as did the assault kit performed on Lankford. When Nejad was arrested, a plastic pellet gun, which looked like a Glock handgun, was found in his vehicle.[3]

Initially, the Court of Appeals addressed the claim of ineffective assistance of counsel, and described the testimony at the hearing on the motion for new trial as follows:

> During the hearing on the motion for new trial, trial counsel unequivocally stated on several occasions that he told Nejad that he was not testifying; that he ordered Nejad to inform the court that he was not going to testify; that he told Nejad that he ruled with an iron fist and that Nejad would have to do as instructed; that Nejad's family asked about him testifying to explain the situation with the gun and he told them that Nejad was not testifying; and that he did not advise Nejad of his right to make the final decision about testifying at trial. Trial counsel testified that he was proud of his reputation, but that he wrongfully made the decision about whether Nejad would testify. Trial counsel also explicitly

---

[3]     Nejad v. State, 296 Ga. App. 163, 164 (2009), *rev'd*, 286 Ga. 695 (2010), *and vacated*, 305 Ga. App. 883 (2010).

recalled that the trial judge did not advise Nejad of his right to testify. Investigator Nicholas McKnight testified that he attended a meeting with Nejad and trial counsel in which Nejad expressed his desire to testify and trial counsel replied that under no circumstances would Nejad be allowed to testify. McKnight also recalled that during that meeting, trial counsel did not inform Nejad of his right to testify. Two attorneys assisted trial counsel in the trial of the case, and both testified that they neither advised Nejad that he was the person who would ultimately decide whether he would testify nor heard anyone else explain this right to Nejad, including the trial judge. The prosecutor testified that she specifically recalled the trial judge reading Nejad the standard admonition about testifying or not testifying and that a couple of months before the new trial hearing, Nejad's defense counsel acknowledged to her that he remembered the judge's admonition as well even though it was not recorded in the transcript. There is a stipulation in the record, however, that the trial judge reviewed his notes from the trial and stated that there was no indication in his notes that he ever advised Nejad of his right to testify.[4]

After citing Eleventh Circuit caselaw holding that the right to testify is personal to the defendant and cannot be waived either by the trial court or by defense counsel, and that a criminal defendant cannot be compelled to remain silent by defense counsel, the Court of Appeals summarized Nejad's testimony at the hearing on the motion for new trial as follows:

> Nejad indicated at the motion for new trial hearing that he was compelled to remain silent. Specifically, he testified that he repeatedly told his trial counsel that he wanted to testify both before trial and during the trial, but his attorney would not allow him to do so; that his trial counsel never told him that the final decision about whether to testify

---

[4]     Id. at 165-166.

was his; that he believed that the decision was to be made by his lawyer; that no one ever explained that it was his decision, including the court; and that had he known it was his right to testify, he would have exercised that right. Accordingly, based on the testimony of defense counsel and Nejad, we find that trial counsel's refusal to allow Nejad to testify and failure to advise Nejad of his right to testify constituted deficient performance and that Nejad has shown that this failure prejudiced his defense.

When asked what his testimony would have been at trial, Nejad testified that on the night in question, he drove to an area where he knew he could find prostitutes; that Lankford approached his car, they talked, and he agreed to give her a ride; that Lankford asked him if he were a cop and when he said he was not, told him it would be $200 for everything; that he purchased condoms, pantyhose, and snacks for Lankford; and that when Lankford asked him about the pantyhose, he told her that he thought they were sexy. Nejad further testified that Lankford voluntarily performed oral sex on him and then when they were about to have intercourse, told him that she was on her period, which annoyed him; that Lankford assured him that it would not be a problem but asked for a napkin to remove her tampon, and he gave her a baby wipe; that he decided he no longer wanted to have sex with Lankford after watching her remove the tampon; and that he asked Lankford for half of the money back, and she refused. Nejad recalled that he exited the car to fix his clothes then saw Lankford jump out with only her shirt on and the rest of her clothes in her hand and run across the parking lot and that he yelled at her that he would send the cops to her hotel. Nejad then left the scene after throwing Lankford's personal items from the window. Nejad testified that he told his trial counsel what happened. He denied that he committed any of the acts for which he was charged against Lankford. Regarding the second victim, Hoy, Nejad testified that he picked her up from the same area; that Hoy asked him to stop and buy her some doughnuts and he complied; that they went to a secluded location where she willingly performed oral sex on him in exchange for $40; and that she asked him to drop her off at a hotel, which he did. Again, Nejad denied that he committed any of the indicted offenses or that he had a replica of a gun. When asked about the fact that both women talked about a gun, Nejad explained that he kept a pellet gun in his glove

compartment, which is where he kept his money clip, so both women would have seen it when he retrieved his money clip and both women were left alone in his car at some point. Nejad maintained that he never removed the pellet gun from the glove compartment. Nejad also testified that on the night that Hoy claims she was assaulted by him, he was with his wife and friends at a club. One of the friends and Nejad's wife at the time of the incident both testified that they were with Nejad on that night.[5]

As to the claim of ineffective assistance of counsel, the Court of Appeals concluded:

> In this case, the jury heard the testimony of the victims and Nejad's stipulation that the physical evidence contained his DNA but did not hear from Nejad that the sexual acts involved were consensual. A defendant's testimony could be crucial in any trial, and as an appellate court, we cannot conclude that the jury would not have found Nejad's testimony credible, and thus the error was harmless. Therefore, despite the evidence against Nejad, we cannot ignore the violation of his constitutional right to testify and must reverse the convictions due to trial counsel's ineffectiveness.[6]

The Court of Appeals also reversed the conviction on the grounds that the trial court erroneously charged that a pellet gun in the shape of an automatic weapon is per se a deadly weapon.[7]

---

[5]     Id. at 167-168.

[6]     Id. at 168-169 (footnote omitted).

[7]     Id. at 169.

The Georgia Supreme Court granted certiorari and reversed the Court of Appeals. As to the claim of ineffective assistance of counsel, the Supreme Court noted that "[t]he transcript of Nejad's trial certified by the court reporter does not reflect that the trial judge informed Nejad of his right to testify and that the decision whether to testify was to be made by Nejad after consulting with counsel."[8] The Supreme Court rejected Nejad's argument that the filing of a written motion to supplement the record was a necessary prerequisite to a trial court's decision to make the record speak the truth. It then stated:

> The trial court conducted an evidentiary hearing regarding the conflict and resolved it by concluding that the trial judge had made Nejad aware of his right to testify and his right to decide whether he would testify. "The trial court's adoption of the prosecutor's [testimony] was dispositive, and is not subject to our review." In effect, the trial transcript has been amended by the trial court's determination to show that Nejad was made aware of his right to testify and to have the final say in whether he exercised that right. In light of the finality of that decision, the Court of Appeals was not authorized to reverse the trial court's determination that Nejad had been advised of his right to testify by the trial judge.[9]

The Supreme Court then held that Judge Bedford (the recused trial judge) could not correct the transcript, and that only Judge Baxter (the motion for new trial judge)

---

[8]   State v. Nejad, 286 Ga. 695, 696 (2010).

[9]   Id. at 698-699 (citation omitted).

could do so. The Supreme Court also held that the Court of Appeals erred when it ruled that the issue of the deadliness of the weapon was for the jury.

Nejad filed this federal habeas corpus action on April 30, 2012. He raises the same three claims that he raised in the motion for new trial and in the direct appeal: (1) the trial court erroneously charged the jury that a pellet gun was per se a deadly weapon; (2) a juror failed to disclose that she was a rape victim; and (3) trial counsel was ineffective. The State agreed that these claims were exhausted and were not procedurally defaulted. The Magistrate Judge concluded that no evidentiary hearing was necessary, and issued his Report and Recommendation on March 28, 2013. The Magistrate Judge correctly summarized the law governing federal habeas corpus relief with respect to a state court conviction. He also properly set forth the standard for ineffective assistance of counsel in <u>Strickland v. Washington</u>.[10] The Magistrate Judge concluded that trial counsels' performance was deficient in that they failed to ensure that the Defendant's right to testify was protected by advising the Defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the Defendant himself to decide. After suggesting that there were reasons why the Defendant would not have testified, the Magistrate Judge concluded

---

[10]   466 U.S. 668 (1984).

that he had not shown prejudice. "Based on the foregoing, it appears that Petitioner was not prejudiced by his counsel's deficient performance because the trial court informed him of his right to testify and because it is unlikely that the outcome of his trial would have been different had he testified."[11] Nejad filed timely objections to the Report and Recommendation.

## II. Discussion

A federal court may issue a writ of habeas corpus on behalf of a person held in custody pursuant to a judgment of a state court if that person is held in violation of his rights under federal law.[12] This power, however, is limited. A federal court may not grant habeas corpus relief for claims previously decided on the merits by a state court unless the decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[13] A state court's determination of

---

[11]     Report and Recommendation [Doc. 15, at 28].

[12]     <u>See</u> 28 U.S.C. § 2254(a).

[13]     28 U.S.C. § 2254(d).

a factual issue is presumed correct unless the petitioner rebuts that presumption "by clear and convincing evidence."[14]

If the federal habeas court determines that the state court decision is not contrary to clearly established federal law, it then considers whether the decision is an "unreasonable application" of that law, i.e., whether "the state court identifies the correct governing legal principle" from the Supreme Court's decisions, "but unreasonably applies that principle to the facts of the prisoner's case."[15] "For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law."[16] "Under § 2254(d)(1)'s 'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly [but r]ather, that application must also be unreasonable."[17] Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on

---

[14]     28 U.S.C. § 2254(e)(1).

[15]     Id. at 413.

[16]     Harrington v. Richter, 131 S. Ct. 770, 785 (2011) (internal quotations omitted).

[17]     Williams v. Taylor, 529 U.S. 362, 411 (2000).

the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[18]

As discussed below, the Defendant's claim that trial counsel denied him the choice of whether to testify is assessed as a constitutional claim of ineffective assistance of counsel. The standard for evaluating ineffective assistance of counsel claims was set forth in Strickland v. Washington.[19] The analysis is two-pronged, and the court may "dispose of ineffectiveness claims on either of its two grounds."[20]

First, Nejad must show that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."[21] The Court must be "highly deferential," and must "indulge a strong presumption that

---

[18]     Richter, 131 S. Ct. at 786-87; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Yarborough v. Gentry, 540 U.S. 1, 5 (2003) ("Where [in a federal habeas corpus petition] the state court's application of governing federal law is challenged, it must be shown to be not only erroneous, but [also] objectively unreasonable.").

[19]     466 U.S. 668 (1984).

[20]     Atkins v. Singletary, 965 F.2d 952, 959 (11th Cir. 1992); see Strickland, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

[21]     Strickland, 466 U.S. at 690.

counsel's conduct falls within the wide range of reasonable professional assistance."[22] Furthermore, "[a] strategic decision . . . will be held to constitute ineffective assistance 'only if it was so patently unreasonable that no competent attorney would have chosen it.'"[23] Second, Nejad must also demonstrate that trial counsel's unreasonable acts or omissions prejudiced him.[24] To show prejudice, he must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[25]

As to the first prong of the Strickland test, this case is controlled by the en banc decision of the Eleventh Circuit in United States v. Teague.[26] There, the court held that "a criminal defendant has a fundamental constitutional right to testify in his or her own behalf at trial. This right is personal to the defendant and cannot be waived either by the trial court or by defense counsel."[27] "[T]he right to testify essentially guarantees

---

[22]   Id. at 689.

[23]   Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987) (citation omitted).

[24]   See Strickland, 466 U.S. at 694.

[25]   Id.

[26]   953 F.2d 1525 (11th Cir. 1992).

[27]   Id. at 1532.

the right to ultimately choose whether or not to testify."[28] Accordingly, "[a] criminal defendant clearly cannot be compelled to testify by defense counsel who believes it would be in the defendant's best interest to take the stand. It is only logical, as the Supreme Court has recognized, that the reverse also be true: A criminal defendant cannot be compelled to remain silent by defense counsel."[29] Critically, as it relates to both prongs of the Strickland test, the court stated:

> The decision whether a criminal defendant should take the witness stand in his own trial unquestionably has tremendous strategic importance. Nevertheless, the mere fact that such a decision involves trial strategy does not itself mandate that the decision ultimately rest with defense counsel. Nor does our conclusion place the right to testify in conflict with the right to counsel. Defense counsel bears the primary responsibility for advising the defendant of his right to testify or not to testify, the strategic implications of each choice, and that it is ultimately for the defendant himself to decide. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a *known* right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis added). Moreover, if counsel believes that it would be unwise for the defendant to testify, counsel may, and indeed should, advise the client in the strongest possible terms not to testify. The defendant can then make the choice of whether to take the stand with the advice of competent counsel.[30]

---

[28]    Id.

[29]    Id.

[30]    Id. at 1532-1533 (footnotes omitted).

After further discussion of the importance to the defendant of making the ultimate

decision as to whether or not to tell his side of the story, the court concluded:

> In summary, we hold that a criminal defendant has a fundamental
> constitutional right to testify on his behalf, that this right is personal to
> the defendant, and that the right cannot be waived by defense counsel.
> Where the defendant claims that this right was violated by defense
> counsel, this claim is properly framed as a claim of ineffective assistance
> of counsel.[31]

The essential holdings of <u>Teague</u> have been reaffirmed many times.[32]

On the first question of deficient performance, the Magistrate Judge was

certainly correct that the performance of Nejad's trial counsel was deficient under the

Sixth Amendment. His lead counsel, Mr. Arora testified as follows:

> Q. [Mr. Steel] AND I KNOW YOUR REPUTATION IS VERY, VERY
> GOOD. WERE YOU ASKED TO REPRESENT MR. ALI NEJAD?
> A. [Mr. Arora]    ABOUT A YEAR BEFORE THE TRIAL, HE
> CAME TO HIRE US, AND I TOLD HIM I DIDN'T WANT TO TAKE
> THE CASE BECAUSE HE HAD ALREADY HIRED MR. TROST
> AND ANOTHER LAWYER OUT OF DEKALB COUNTY. HE CAME
> BACK TO ME ABOUT 6 WEEKS BEFORE THE TRIAL AND

---

[31]    <u>Id.</u> at 1535.

[32]    <u>See</u> <u>Nichols v. Butler</u>, 953 F.2d 1550 (11th Cir. 1992) (en banc)
(defendant was denied both effective assistance of counsel and his right to testify by
his trial attorney's threat to withdraw during trial if defendant chose to testify); <u>Cain
v. Secretary, Florida Dep't of Corr.</u>, 266 Fed. Appx. 854 (11th Cir. 2008); <u>Lopez v.
United States</u>, 522 Fed. Appx. 684 (11th Cir. 2013) (district court could not
reasonably conclude that defense counsel was not ineffective in prohibiting defendant
from exercising his right to testify).

ASKED IF I COULD WORK ON HIS CASE, AND I AGREED, AND I GAVE HIM VERY SPECIFIC CONDITIONS ON HOW I WOULD WORK ON THE CASE BECAUSE IT WAS SO CLOSE TO TRIAL.

Q.    OKAY. YOU SAID HIRE US, AND THEN YOU SAID HIRE ME, AND ARE WE TALKING ABOUT --

A.    THE LAW FIRM, THE GARLAND, SAMUEL LAW FIRM. I WAS GOING TO BE THE PRIMARY COUNSEL. HE WANTED TO HIRE ME A YEAR BEFORE TRIAL. I SAID YOU HAVE ALREADY GOT GOOD LAWYERS. LET THEM DEAL WITH IT. THEN WHEN THE TRIAL WAS COMING UP A YEAR LATER, HE INSISTED, HIS FAMILY INSISTED, AND I DECIDED TO TAKE THE CASE.

Q.    AND WHAT WERE THE SPECIFIC GROUND RULES -- I DON'T KNOW IF THAT'S THE WORD YOU USED -- ON YOUR DECISION THAT YOU WOULD AGREE TO REPRESENT MR. NEJAD?

A.    I WANTED MOST OF THE LAWYERS OUT OF THE CASE. THERE WERE TOO MANY PEOPLE THERE. I RULE WITH AN IRON FIST. I TOLD HIM YOU HAVE TO LISTEN TO WHAT I SAY.

Q.    AND WHO BECAME WHEN YOU WERE HIRED WHAT THE PRACTICE OF LAW WOULD KNOW AS THE LEAD LAWYER?

A.    THAT WAS ME.

Q.    YOU STATED THAT YOU CONDUCTED THIS CASE OR THE REPRESENTATION OF MR. NEJAD WITH AN IRON FIST. WHAT DID YOU MEAN BY THAT?

A.    I LIKE TO HAVE SOLID CONTROL. YOU KNOW, I GO THROUGH IT. I TELL THEM THIS IS WHAT'S GOING TO HAPPEN. THIS IS HOW WE ARE GOING TO DO THINGS. AND I SAID AT THIS TIME, I DON'T HAVE TIME TO DEBATE WITH YOU ABOUT DIFFERENT ISSUES. IT IS TOO CLOSE TO TRIAL, AND THIS IS HOW WE ARE GOING TO DO IT, AND WE STARTED, FIRST OF ALL, WITH WHO THE LAWYERS WOULD BE. WE WENT FROM THERE.

Q.    WHEN YOU SAY YOU RULE WITH AN IRON FIST CONCERNING CLIENT CONTROL, LET'S TALK JUST SPECIFICALLY ABOUT MR. NEJAD'S CASE. IS THAT HOW YOU CONDUCTED YOURSELF WITH MR. NEJAD, WITH MR. NEJAD'S DEFENSE IN THIS CASE?

A.      YES. THERE WAS A LOT OF MOTIONS THAT NEEDED TO BE FILED THAT HADN'T BEEN FILED, AND THERE WAS A LOT TO DO WITH THIS CASE. I STARTED DRAFTING THEM RIGHT AWAY. THERE WAS AN ALIBI ISSUE THAT HADN'T BEEN FILED WHEN IT WAS DUE MONTHS IN ADVANCE OF THAT. SO THERE WAS A LOT OF THOSE THINGS THAT I WAS VERY SPECIFIC ON WITH HIM.

Q.      AND HOW MUCH TIME DID YOU SPECIFICALLY SPEND, IF YOU CAN GIVE US A GENERALITY OF HOW YOU WERE GETTING READY FOR TRIAL AND DURING TRIAL WITH MR. NEJAD HIMSELF?

A.      BETWEEN DEALING WITH HIM AND HIS FAMILY, GETTING THE ALIBI WITNESSES TOGETHER, FINING EXPERTS IN PSYCHIATRY TO DEAL WITH REOFFENDER ISSUES THAT WE ALL PLANNED FOR JUST IN CASE THERE IS A SENTENCING ARGUMENT, I MUST HAVE SPENT HUNDREDS AND HUNDREDS OF HOURS.

I WILL LET YOU KNOW, AND I WILL LET THE COURT KNOW I DO MAYBE 2 TRIALS AT MOST A YEAR SINCE I HAVE BEEN IN PRIVATE PRACTICE. THEY ARE USUALLY CONTENTIOUS, LENGTHY, AND I DON'T DO ANYTHING ELSE FOR THAT 5 OR 6 WEEK PERIOD PRIOR TO TRIAL, INCLUDING THE TRIAL, BUT WORK ON THE ONE CASE. AND SO MR. JOSHI SAYS I SPENT EVERY MOMENT WITH HIM. I'M SPENDING IT WITH HIM, HIS MOM, HIS DAD, THE TWO PSYCHIATRISTS THAT WE HAD HIRED, WORKING ON THE ALIBI WITH HIS EX-WIFE, EVERYTHING; AND THAT'S ALL I DID FOR PROBABLY CLOSE TO 2 MONTHS.

Q.      SO YOU GAVE ALL OF YOURSELF ONCE YOU WERE HIRED TO THE CASE OF STATE OF GEORGIA VERSUS MR. NEJAD?

A.      PEOPLE PAY US A LOT OF MONEY, AND THEY DESERVE THE BEST REPRESENTATION.

Q.      WHOSE RESPONSIBILITY WAS IT, IF ANYBODY, TO PREPARE MR. NEJAD FOR TESTIMONY AT A TRIAL IF HE WERE TO GIVE SUCH TESTIMONY?

A.      EVERYTHING IN THE CASE WAS MY RESPONSIBILITY. I DELEGATED CERTAIN ISSUES ON TO MR. TROST AND TO MR. JOSHI, AS I SAID, BUT I STAYED IN CLOSE COMMUNICATIONS WITH THEM, AND WE WENT OVER POTENTIAL ISSUES IN THEIR QUESTIONING OF THE POLICE OFFICERS, WHOMEVER THEY WERE GOING TO TAKE, AND WE TALKED ABOUT IT WITH ME ON EVERY SINGLE ISSUE. I WAS RESPONSIBLE FOR ALL OF IT.

Q.      HOW ABOUT DID THE ISSUE EVER COME UP WITH PREPARATION, IF ANY, FOR MR. NEJAD TO POSSIBLY TESTIFY IN HIS TRIAL?

A.      HE ASKED TO TESTIFY PROBABLY A FEW WEEKS AFTER WE WERE HIRED. I TOLD HIM ABSOLUTELY NOT. BUT WHAT I TOLD HIM IS I WILL PREP HIM JUST IN CASE THE TRIAL STARTS GOING SOUTH, IN CASE HE NEEDS TO TAKE THE STAND AND I DECIDE HE SHOULD TAKE THE STAND. I DID THAT SPECIFICALLY DURING THE TRIAL. HE ASKED MANY TIMES ABOUT CERTAIN ISSUES HE WANTED TO TESTIFY ABOUT.  DURING TRIAL I THOUGHT THINGS WERE GOING PRETTY WELL, AS FAR AS THE CROSS-EXAMINATION, AND I TOLD HIM HE IS NOT TESTIFYING.

Q.      LET'S JUST TAKE THAT MUCH SLOWER THAN YOU JUST GAVE IT TO US ON THE RECORD. WHEN IS THE FIRST TIME THAT MR. NEJAD EVER MADE IT KNOWN TO YOU THAT HE WISHED TO TESTIFY IN HIS OWN BEHALF AT TRIAL? THAT'S WHAT I HEARD YOU JUST SAY; IS THAT CORRECT?

A.      BEFORE TRIAL. I DON'T KNOW IF IT WAS 2 WEEKS BEFORE TRIAL OR 3 WEEKS BEFORE TRIAL, BUT IT CAME UP BECAUSE I WENT OVER ALL THE EVIDENCE. I GAVE HIM COPIES OF EVERYTHING, AND I WANTED EXPLANATIONS TO ALL THE ISSUES THAT I HAD. AND HE SAID I COULD SAY THIS AND THAT AND THE OTHER. I SAID, THAT'S FINE. I WILL PREP YOU FOR IT JUST IN CASE, BUT YOU ARE NOT GOING TO TESTIFY BECAUSE IT ALWAYS ENDS UP BEING NO MATTER HOW WELL THE TRIAL GOES, WHEN THE DEFENDANT TAKES THE STAND, EVERYTHING YOU HAVE DONE IS SORT OF BY THE SIDE. IT IS SIMPLY GOING TO BE WHETHER THEY

BELIEVE OR LIKE THE DEFENDANT WILL RULE THE CASE. SO I TOLD HIM YOU ARE NOT TESTIFYING.

YOU KNOW, IN READING THE BRIEF, I WISH I WOULD HAVE SAID SOME OF THE OTHER THINGS THAT ARE REQUIRED UNDER THE LAW. I DIDN'T. I SIMPLY ORDERED HIM TO SAY YOU ARE NOT TESTIFYING. I SAID I'M MAKING THE DECISION YOU ARE NOT TESTIFYING, AND I DID -- MUST HAVE DONE THAT ON MULTIPLE OCCASIONS.

Q.     WHEN YOU SAY YOU OFFERED HIM NOT TO TESTIFY, WHO WERE YOU ORDERING THAT YOU ARE NOT TESTIFYING?

A.     I TOLD HIM, I SAID YOU ARE NOT TESTIFYING.

Q.     WHO IS HIM?

A.     MR. NEJAD.

Q.     DID YOU EVER EXPLAIN TO MR. NEJAD THAT ALTHOUGH THAT WAS YOUR DESIRE OR LEANING OR STRONGEST ADVICE, DID YOU EVER EXPLAIN TO MR. NEJAD IT IS UP TO YOU TO MAKE THE ULTIMATE DECISION WHETHER YOU TESTIFY OR NOT?

A.     I DON'T THINK I SAID THE WORDS. LET ME EXPLAIN SOMETHING TO YOU. INITIALLY, I THOUGHT THIS APPEAL WAS GOING TO GO FORWARD ON THE MOTION TO SUPPRESS ON SOME OF THE DNA THINGS BECAUSE I HAD WRITTEN BRIEFS ON A LOT OF THAT STUFF EVEN DURING THE COURSE OF THE TRIAL. I GOT A COPY OF THE SECOND AMENDED MOTION ALLEGING THIS INEFFECTIVENESS AGAINST ME, AND I TALKED TO MR. MALLON VERY BRIEFLY ABOUT IT, AND HE FAXED ME A COPY AS MUCH AS YOU DID LAST WEEK WHILE I WAS ON VACATION WITH MY WIFE. I HAVE THOUGHT ABOUT THIS FOR THE LAST 3 OR 4 DAYS. I LOOKED THROUGH EVERYTHING I COULD THINK OF. I DON'T RECALL AT ANY POINT TELLING HIM, MR. NEJAD OR ALI OR WHATEVER, IT IS YOUR DECISION. I BASICALLY SAID YOU ARE NOT TESTIFYING. HIS FAMILY HAD ASKED HIM ABOUT HIM TESTIFYING BECAUSE HE COULD EXPLAIN THE SITUATION WITH THE GUN, WHICH WAS QUITE CRITICAL,

AND I TALKED TO DIFFERENT FAMILY MEMBERS ABOUT IT, AND I SAID HE IS NOT TESTIFYING.

Q.      SO WHO MADE THE ULTIMATE DECISION ON WHETHER MR. NEJAD TESTIFIED OR DIDN'T TESTIFY IN THIS CASE?

A.      YOU KNOW, I PRIDE MYSELF ON MY REPUTATION, BUT I REALLY THINK IN THIS CASE I MADE THAT ULTIMATE DECISION. I THINK IT WAS OBVIOUSLY WRONG OF ME, AND I DON'T SAY THAT LIGHTLY, BUT IT IS SOMETHING THAT I REALLY FEEL LIKE I MADE A MISTAKE ON IN THIS CASE. BECAUSE I TOLD HIM AND HIS FAMILY THAT HE WASN'T GOING TO TESTIFY; AND, YOU KNOW, EGO ASIDE, I DON'T KNOW WHAT ELSE TO TELL YOU.[33]

Mr. Arora's testimony continued:

Q.      YOU HEARD MR. MALLON QUESTION MR. TROST AND MR. JOSHI TODAY CONCERNING WHETHER THEY ASSUMED, POSSIBLY SPECULATED THAT NOT ON THE RECORD JUDGE BEDFORD ADVISED MR. NEJAD THAT IT WAS MR. NEJAD'S DECISION NO MATTER WHAT HIS LAWYER'S ADVICE WAS, THE ULTIMATE DECISION WAS WITH MR. NEJAD WHETHER TO TESTIFY AT TRIAL OR NOT. DO YOU REMEMBER HEARING ALL THOSE QUESTIONS?

A.      I HEARD ALL THE QUESTIONS.

Q.      THE TRANSCRIPT, CLEARLY EVERYONE STIPULATES, DOESN'T HAVE ANYTHING CLOSE TO THE HONORABLE JUDGE BEDFORD ADVISING MR. NEJAD OF HIS RIGHT TO TESTIFY.

A.      THERE WERE NO BREAKS TAKEN. THAT NEVER HAPPENED.

Q.      HOW DO YOU KNOW THAT? DO YOU HAVE A SPECIFIC MEMORY?

A.      I HAVE A SPECIFIC MEMORY OF THIS BECAUSE IT IS SURPRISING IT DIDN'T HAPPEN. I HAVE SPECIFIC MEMORIES

---

[33]      Transcript of Motion for New Trial [Doc. 12-2, at 34-40].

OF CERTAIN JURY CHARGES, AS FAR AS THE GUN BEING PRESUMED FORCEFUL. ALL THOSE THINGS, YOU KNOW, THAT I THOUGHT WERE INCONSISTENT WITH THE LAW. AND I PUT MY LIFE INTO THIS CASE. NO OFFENSE TO THE OTHER LAWYERS, BUT THEY HAD OTHER PRACTICES GOING ON. THIS WAS IT FOR ME. I PUT NIGHT AND DAY INTO THIS CASE BACKWARDS AND FORWARDS. THOSE TYPES OF THINGS DIDN'T HAPPEN. MUCH LIKE THE JUROR ISSUE I'M SURE YOU WILL ASK ME ABOUT.

Q.     I WILL GET TO THAT IN A MOMENT. BUT, SO YOU KNOW SPECIFICALLY  FROM MEMORY THAT THE TRANSCRIPT IS ACCURATE AND MR. NEJAD WAS NEVER ADVISED BY ANYBODY TO YOUR KNOWLEDGE THAT HE -- IT WAS UP TO HIM WHETHER TO DECIDE TO TESTIFY OR NOT?

A.     I WAS VERY PARTICULAR IN THIS CASE. EVEN THE BENCH CONFERENCES WE HAD AT – MOST THE TIMES WE HAD PUT ON THE TRANSCRIPT AT THE APPROPRIATE BREAKS. WE HAD EVERYTHING PUT DOWN BECAUSE I DIDN'T WANT ANY MISTAKES IN THIS MATTER. THAT DIDN'T HAPPEN, AND WHEN YOU READ THE TRANSCRIPT, THERE IS NOT A BREAK WHERE THE COURT REPORTER COULD HAVE FORGOTTEN SOMETHING AS CRITICAL AS THE JUDGE MAKING THE DEFENDANT STAND UP AND ADVISING HIM OF HIS RIGHTS SHORTLY AFTER, YOU KNOW, WE RESTED THE ALIBI WITNESSES.

Q.     I WOULD LIKE TO – IS THERE ANYTHING ELSE – OR DID YOU HEAR MR. MCKNIGHT TESTIFY TODAY?

A.     YES.

Q.     IS THAT ACCURATE, OR YOU HAVE A MEMORY OF MR. MCKNIGHT BEING PRESENT.

A.     ALL I KNOW IS WE TALKED ABOUT IT. MR. MCKNIGHT WAS PRESENT AT SEVERAL OF THOSE THINGS WHILE I WAS GIVING HIM HIS INSTRUCTIONS ON WHAT I NEEDED TO DO WITH REGARDS TO LOOKING AT BACKGROUNDS ON THE VICTIMS AND SIMILAR TRANSACTIONS. IT WOULDN'T SURPRISE ME IF HE WAS THERE. I WILL TELL YOU NOW AND

I WILL TELL EVERYBODY I TOLD HIM HE IS NOT TESTIFYING,
PERIOD.
   THE COURT: WELL, THAT'S PRETTY ARROGANT, ISN'T
IT?
   THE WITNESS: IT WAS A BAD MISTAKE.[34]

He continued:

 Q. OKAY. NOW, IS IT YOUR ORDINARY PRACTICE THAT
THE ULTIMATE DECISION WHETHER TO TESTIFY, THAT YOU
INFORM THE CLIENT THAT THE ULTIMATE DECISION
WHETHER TO TESTIFY IS HIS, BUT HERE IS MY ADVICE? ISN'T
THAT YOUR ORDINARY PRACTICE?
 A. IN FACT, GUILTY PLEAS I TAKE AS A DEFENSE LAWYER,
I ACTUALLY WRITE UP A MEMO SAYING WE WENT THROUGH
ALL THE ISSUES SO THERE WON'T BE PROBLEMS ON THE
BACK END. YOU AND I WORKED TOGETHER. YOU KNOW ME
TO BE PRETTY METICULOUS. EVERY ISSUE IN A CASE I
BRIEFED EVEN THAT NIGHT OR THE NEXT MORNING. SO IT
WAS ALL IN WRITING.
IN THIS SITUATION, I CANNOT HONESTLY SAY YOU ARE NOT
TESTIFYING, BUT IT IS YOUR DECISION. I DON'T REMEMBER
SAYING THOSE WORDS. IT DIDN'T STRIKE ME AS THAT HUGE
OF A DEAL BECAUSE THIS WAS ALWAYS GOING TO GO TO
TRIAL. THE OFFER WAS SO HIGH THAT THERE REALLY
WASN'T AN ISSUE, AS FAR AS THAT GOES. WE ARE
PREPARING WHAT WITNESSES WE WERE GOING TO CALL.
ALL THOSE TYPES OF THINGS. I MEAN, I DON'T KNOW WHAT
ELSE TO SAY.
THE JUDGE IS RIGHT. I'M ARROGANT. I'M A JERK, AND I DID
A REALLY STUPID THING, AND I SHOULD BE CALLED FOR
IT.[35]

---

[34] Transcript of Motion for New Trial [Doc. 12-2, at 43-45].

[35] Transcript of Motion for New Trial [Doc. 12-2, at 50-51].

This testimony was not seriously questioned at the motion for new trial and was certainly not rebutted by any testimony presented by the State. Mr. Trost and Mr. Joshi (the Defendant's other trial attorneys) testified without contradiction that they did not advise Nejad of his constitutional right to testify. Nejad testified as follows:

> Q.    YOU HAVE HEARD THE TESTIMONY OF ALL COUNSEL MEANING MR. TROST, MR. JOSHI, MR. ARORA, AND INVESTIGATOR MCKNIGHT; IS THAT TRUE?
>
> A.    YES.
>
> Q.    ALL RIGHT. I WANT YOU TO LOCK IN ON AND FOCUS ON WHAT YOU KNEW ABOUT YOUR RIGHTS WHETHER TO TESTIFY OR NOT TESTIFY AT THE TRIAL THAT WAS HELD BEFORE THE HONORABLE JUDGE BEDFORD, OKAY.
>
> A.    YES.
>
> Q.    EXPLAIN TO THIS COURT WHAT YOU KNEW GOING INTO THE TRIAL; NOT SINCE I HAVE BEEN REPRESENTING YOU, ABOUT WHOSE DECISION IT WAS WHETHER YOU GET TO TESTIFY OR NOT GET TO TESTIFY AT YOUR TRIAL.
>
> A.    I DIDN'T KNOW ANYTHING ABOUT WHOSE DECISION IT WAS.
>
> Q.    DID YOU WANT TO GET UP BEFORE THE PETIT JURY AND TESTIFY?
>
> A.    YES, I DID.
>
> Q.    WHY DIDN'T YOU EVER TAKE THE WITNESS STAND AND TESTIFY BEFORE THE PETIT JURY?
>
> A.    BECAUSE MY ATTORNEY MANNY ARORA DID NOT ALLOW ME TO.
>
> Q.    DID MR. ARORA EVER TELL YOU THAT THE ULTIMATE, MEANING THE FINAL DECISION RESTS AT YOUR FEET?
>
> A.    NO, SIR.
>
> Q.    WHETHER TO TESTIFY OR NOT TESTIFY?
>
> A.    NO, SIR.
>
> Q.    WHAT -- WHO DID YOU BELIEVE DURING TRIAL OR BEFORE TRIAL OR AFTER SENTENCING, UNTIL AFTER

SENTENCING, WHO DID YOU BELIEVE MADE THE DECISION ON WHETHER YOU COULD BE CALLED AS A WITNESS IN YOUR OWN TRIAL?

A.   MY ATTORNEY MANNY.

Q.   THAT'S WHO YOU BELIEVE HAD THAT ULTIMATE DECISION?

A.   YES, SIR.

Q.   DID ANYBODY EVER EXPLAIN TO YOU FROM ANY MEANS, THE HONORABLE JUDGE BEDFORD, MR. JOSHI, MR. TROST, MR. MCKNIGHT, ANYBODY EVER EXPLAIN TO YOU THAT, ACTUALLY, IT WAS NOT A LAWYER'S DECISION, BUT TOUR DECISION WHETHER YOU WILL TESTIFY OR NOT?

A.   NO, SIR.

Q.   MR. TROST TESTIFIED THAT HE SUCCESSFULLY REPRESENTED YOU IN A DEKALB COUNTY MATTER. THAT A DIRECTED VERDICT OF ACQUITTAL, MEANING IT NEVER GOT TO THE JURY WAS RENDERED BY THE TRIAL COURT ONCE THE PROSECUTOR RESTED. DO YOU REMEMBER THAT?

A.   YES, SIR, I DO.

Q.   IN THAT PROSECUTION, DID YOU EVER HAVE ANY CONVERSATION OR INFORMATION OR UNDERSTANDING THAT THE DECISION WHETHER YOU CAN TESTIFY WAS YOURS?

A.   NO, SIR.

Q.   IN THIS CASE, THE CASE WE ARE APPEALING, OKAY, DID YOU WANT TO TESTIFY AT YOUR TRIAL?

A.   ABSOLUTELY.

Q.   WHO DID YOU TELL THAT YOU ABSOLUTELY WANTED TO TESTIFY AT TRIAL TO?

A.   MANNY ARORA.

Q.   HOW MANY TIMES DID YOU TELL MR. ARORA THAT YOU WANTED TO TESTIFY IN YOUR OWN DEFENSE?

A.   SEVERAL.

Q.   WHEN DID YOU TELL MR. ARORA THAT YOU WANTED TO TESTIFY IN YOUR OWN DEFENSE?

A.   I TOLD HIM BEFORE TRIAL, AND I TOLD HIM DURING TRIAL.

Q.    AND WHAT WAS MR. ARORA'S RESPONSE TO YOU?

A.    YOU ARE NOT TESTIFYING.

Q.    AND IS THAT THE REASON THAT YOU DID NOT TESTIFY?

A.    YES, SIR.

Q.    YOU HAVE HEARD MR. ARORA SAY THAT THE JUDGE, MEANING THE TRIAL JUDGE, JUDGE BEDFORD NEVER ADVISED YOU THAT YOU HAD THE RIGHT AND ULTIMATE CHOICE WHETHER TO TESTIFY OR NOT. YOU HEARD MR. ARORA TESTIFY?

A.    YES, SIR, I DID.

Q.    WAS MR. ARORA CORRECT?

A.    YES, HE WAS.

Q.    DID JUDGE BEDFORD EVER TELL YOU IN ANY TERMS, WHETHER ON THE RECORD OR NOT, THAT IT WAS DECISION TO TESTIFY?

A.    NO, SIR. IF HE WOULD HAVE, I WOULD HAVE EXERCISED THAT RIGHT.[36]

This testimony was also not rebutted. Indeed, in his Brief in Support of Answer-Response, the Respondent does not even discuss the issue of deficient performance by trial counsel. The evidence overwhelmingly shows that trial counsels' performance was deficient under the Strickland and Teague standards.

With respect to the issue of prejudice, the Respondent argues that the Georgia Supreme Court's finding that Nejad failed to show prejudice, because the record as supplemented demonstrated that Nejad had been advised by the trial court of his right

---

[36]    Transcript of Motion for New Trial [Doc. 12-2, at 55-57].

to testify and his right to decide whether he would testify, is entitled to deference. I agree. Nevertheless, after careful review of the transcript of the hearing on the motion for new trial and the relevant portions of the trial transcript, I am convinced that this finding is an unreasonable determination of the facts in light of the evidence presented.

The evidence presented at the hearing on the motion for new trial overwhelmingly supported the conclusion that the trial judge never advised the Defendant of his right to testify and never advised him that it was ultimately his decision to make. First – and most importantly – the certified transcript of the trial shows that the trial judge never did this.[37] When the trial judge did address the Defendant – such as when he waived his presence at a visit to the scene by the judge and the lawyers – it appears in the transcript.[38] The trial transcript as certified by the court reporter is presumed to be true, complete and correct.[39] Where the transcript is not supplemented, the complaining party does not carry its burden of showing by the

---

[37]    The transcript shows that there were plenty of unrecorded bench conferences. But nobody contends that the Defendant was advised of his right to testify at a bench conference.

[38]    Transcript of Jury Trial [Doc. 10-11, at 141].

[39]    O.C.G.A. § 15-14-5; State v. Nejad, 286 Ga. 695 (2010).

record the facts necessary to establish its point.[40] Acknowledging these principles of

law, the Georgia Supreme Court held:

> In the case at bar, Nejad knew of the purported deficiency and
> participated in an evidentiary hearing centered, in part, on establishing
> the deficiency, without voicing an objection to the lack of a written
> motion having been filed. Two weeks after the hearing, Nejad joined the
> State in submitting a stipulation regarding the trial judge's recollection
> of events, again without objection to the presentation of the issue to the
> trial court for resolution. In effect, Nejad acquiesced in the State's
> presentation of its theory that the trial transcript was incomplete and in
> the State's effort to have the discrepancy resolved so as to make the
> record conform to the truth.[41]

This finding – that by participating in a contested hearing the Defendant acquiesced

to the court adopting the position taken by his adversary – is objectively unreasonable.

   Second, the testimony of all three defense attorneys contradicted – with varying

degrees of force – the State's contention that the trial judge fully advised the

Defendant of his right to testify. Mr. Arora's testimony as set forth above was the

most certain and emphatic. The order presented by the prosecutor to Judge Baxter

stated that "neither Mr. Arora nor Mr. Trost nor Mr. Joshi could swear positively that

Judge Bedford did not inform Mr. Nejad that the ultimate decision to testify was his

---

[40]   Thomas v. State, 208 Ga. App. 367, 368 (1993).

[41]   State v. Nejad, 286 Ga. 695, 698 (2010).

and not the attorney's."[42] As to Mr. Arora, this is just wrong and an objectively unreasonable factual finding by the state court.[43] As to Mr. Trost, he testified that "I can't say it didn't happen. Nor does my recollection support that it did." Mr. Joshi testified that he did not have a memory of Judge Bedford admonishing the Defendant that it was his decision whether to testify or not. Their testimony is consistent with what the transcript shows:

> THE COURT: OKAY. LET'S BRING THE JURY IN. (WHEREUPON, THE JURY RETURNED TO THE COURTROOM, AFTER WHICH THE FOLLOWING PROCEEDINGS WERE HAD.)
> THE COURT: ALL RIGHT. HAVE A SEAT, LADIES AND GENTLEMEN. GOOD MORNING TO YOU, AND I WANT TO THANK YOU VERY MUCH GIVEN THE WEATHER THAT EVERYBODY WAS TIMELY HERE. AND WE'VE BEEN WORKING AND ONE OF THE THINGS IS TRYING TO SET UP THE COURTROOM AND CONNECT ALL THE WIRES TO EVERYTHING. OKAY.
> DEFENSE?
> MR. ARORA: JUDGE, WE'RE GOING TO GO AHEAD AND REST AND READY FOR CLOSING.
> THE COURT: ALL RIGHT. REBUTTAL?
> MS. DUNIKOSKI: NOTHING FROM THE STATE.

---

[42]    Order Denying Motion for New Trial [Doc. 9-6, at 85].

[43]    The Georgia Court of Appeals quite accurately stated that: "Trial counsel [Mr. Arora] also explicitly recalled that the trial judge did not advise Nejad of his right to testify." Nejad v. State, 296 Ga. App. 163, 165 (2009).

THE COURT: ALL RIGHT. LADIES AND GENTLEMEN, THEN THE EVIDENCE IS CLOSED IN THE CASE, AND IT'S READY TO BE ARGUED TO YOU.[44]

If the trial court had advised the Defendant of his right to testify, this is the logical place for it to happen after the defense rested. The transcript shows that it did not happen.

Third, the trial judge did not testify that he had advised the Defendant of his right to testify. Shortly after the hearing on the motion for new trial, the parties entered into the record a stipulation stating the following:

> The Honorable Judge Bedford's office was contacted concerning whether the Honorable Judge Bedford had any recollection or insight into whether his Court advised Mr. Nejad during the trial of the above-referenced Case Number of his rights concerning that it was his decision to testify at trial or not to testify. The Honorable Judge Bedford reviewed his notes from Mr. Nejad's trial and stated that he does not have any indication in his notes that he ever advised Mr. Nejad of his rights to testify.[45]

There are several things that must be said about this. The obvious conclusion is that Judge Bedford did not remember advising the Defendant of his right to testify. If he had advised the Defendant of his right to testify, he would have indicated that in his trial notes. His trial notes do not indicate that he advised the Defendant of his right to

---

[44]     Transcript of Jury Trial [Doc. 11-7, at 25-26].

[45]     Stipulation by the Parties [Doc. 9-25, at 63].

testify. Therefore, he probably – consistent with the trial transcript – did not. The Georgia Supreme Court's finding that entering into the stipulation was an acquiescence by the Defendant in the State's attempt to revise the transcript is objectively unreasonable.

Of course, Nejad also swore that the trial judge did not advise him of his right to testify.[46] But disregarding Nejad's testimony, I have to say that the overwhelming evidence was that the trial judge did not advise Nejad of his right to testify, and certainly did not advise him that it was his decision to make. So, what was the evidence relied upon by the state courts to find that the trial judge properly advised Nejad of his right to testify? Not much. They relied entirely upon the testimony at the hearing on the motion for new trial of the prosecutor, Ms. Dunikoski. This was only her second trial and her first rape case as lead counsel. She testified that she had a vivid recollection of Judge Bedford advising the Defendant of his right to testify:

> Q.     DO YOU HAVE ANY PERSONAL RECOLLECTION ABOUT WHETHER HE WAS INFORMED OF HIS RIGHT TO TESTIFY, SPECIFICALLY THAT THE DECISION TO TESTIFY WAS HIS AND NOT THE ATTORNEY'S?
> A.     YES. I HAVE A VERY, VERY CLEAR RECOLLECTION BECAUSE THE ONLY RAPE TRIAL I HAD EVER TRIED, I HAD ACTUALLY SECOND-CHAIRED WITH MR. JOSHI, AND HE HAD KIND OF TRAINED ME UP, AND THAT IS THE ONLY RAPE

---

[46]     Transcript of Motion for New Trial [Doc. 12-2, at 56].

TRIAL I HAD EVER SAT ON. I WAS NERVOUS, BUT I WAS
PREPARED, AND AS A PROSECUTOR, THE DEFENDANT
TAKING THE STAND CAN MAKE OR BREAK YOUR CASE. YOU
DON'T KNOW WHAT THEY ARE GOING TO SAY.
SO I WAS SITTING IN THAT CHAIR. I DISTINCTLY REMEMBER
LOOKING OVER AT THE DEFENDANT, WHO HAD STOOD UP;
HIS THREE ATTORNEYS WERE SEATED, AND JUDGE BEDFORD
READING HIM THE STANDARD ADMONITION ABOUT
TESTIFYING OR NOT TESTIFYING BECAUSE I WAS GOING TO
HAVE TO CROSS HIM, AND I WAS NERVOUS BECAUSE JURIES
EXPECT WHAT THEY SEE ON TV. THEY EXPECT THE
PROSECUTOR TO RIP THE DEFENDANT UP ONE SIDE AND
DOWN THE OTHER, AND I DIDN'T KNOW WHAT HE WAS
GOING TO SAY. SO I HAD PREPARED, BUT I WAS A LITTLE
NERVOUS, AND I WAS HOLDING MY BREATH LOOKING OVER
AT HIM WAITING TO SEE WHAT HIS ANSWER WAS GOING TO
BE TO JUDGE BEDFORD ABOUT WHETHER HE WAS GOING TO
TESTIFY OR NOT. AND I HAVE A VERY CLEAR MEMORY OF
THAT BECAUSE OF THE SITUATION I WAS IN WITH THIS
BEING MY FIRST LEAD COUNSEL ON A RAPE CASE.[47]

That is all that she said.[48]

Several things must be said about this testimony. First, Ms. Dunikoski never

testified to what Judge Bedford said to the Defendant. She only said that he read him

"the standard admonition about testifying or not testifying." No evidence was

presented as to what is in this standard admonition even if there is such a thing. She

---

[47]     Transcript of Motion for New Trial [Doc. 12-2, at 88-89].

[48]     The other Assistant District Attorney who represented the State at the
trial did not testify at the hearing on the motion for new trial.

never testified that Judge Bedford told the Defendant that he was the one who had to make the decision about whether he would testify. She may not have known that this was the law. She was certainly an unreliable witness. Her memory conflicted with the certified trial transcript on at least three points: (1) whether the trial judge advised the Defendant of his right to testify; (2) whether a juror stated during voir dire that she had been raped; and (3) whether there was a stipulation about DNA evidence. She had no explanation for the fact that her version of what happened does not appear in the transcript.[49] This was a young prosecutor whose first big trial was about to blow up in her face. Call it what you will – wishful thinking, an inaccurate memory, whatever – her testimony about the trial was unreliable and it was objectively unreasonable for the state courts to rely upon her testimony rather than the certified transcript of the trial.

Unfortunately, one more issue regarding Ms. Dunikoski's testimony must be addressed. As noted above, she said nothing about whether the trial judge advised Nejad that he had the right to make the decision about whether to testify. Assistant District Attorney Mallon prepared and presented an order for Judge Baxter to sign denying the motion for new trial. The order contained this language:

---

[49]     Transcript of Motion for New Trial [Doc. 12-2, at 97].

> The Court finds as fact that Mr. Nejad failed to prove prejudice from any failure of trial counsel to properly define his right to testify, inasmuch as the credible evidence at the hearing shows that Mr. Nejad was in fact so informed by the trial court that *the ultimate decision whether to testify was his alone, made after hearing the advice of his attorneys*.[50]

There is no evidence in the record that the judge ever made the statement in italics. Ms. Dunikoski said nothing about Nejad being properly advised by his attorneys. The only testimony at the hearing on the motion for new trial was that he was *not* properly advised about his right to testify. It was objectively unreasonable for the judge to sign the order containing the statement that "Mr. Nejad was in fact so informed by the trial court that the ultimate decision whether to testify was his alone, made after hearing the advice of his attorneys." It was objectively unreasonable for the Georgia Supreme Court to find that: "In effect, the trial transcript has been amended by the trial court's determination to show that Nejad was made aware of his right to testify and to have the final say in whether he exercised that right." There is no evidence in the record to support this finding.

That leads to the final question: is there "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

---

[50]      Order Denying Motion for New Trial [Doc. 9-6, at 83] (emphasis added).

different."[51] "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[52] In his Report and Recommendation, the Magistrate Judge points out that trial counsel had identified certain risks that the Defendant would run if he testified – such as opening the door to evidence of similar transactions. But that was in the context of preparing for sentencing. During opening statements, both the prosecutor and defense counsel discussed at length the similar transaction incidents. During its case in chief, the State presented evidence of the similar transactions. So testifying did not increase the risk that similar transaction evidence would come in. Not testifying meant that there was no evidence of his side of the story. In Teague, the court observed:

> When an individual stands accused of criminal conduct, the choice to tell his side of the story has ramifications far beyond the more immediate goal of obtaining an acquittal. It is, after all, the defendant's day in court. The decision to take the stand in his own defense, like the decision to plead not-guilty and proceed to trial, provides the defendant with an opportunity directly to meet the charges against him. "The wisdom or unwisdom of the defendant's choice does not diminish his right to make it." Wright, 572 F.2d at 1079 (Godbold, J., dissenting). [53]

---

[51]    Morris v. Secretary, Dep't of Corr., 677 F.3d 1117, 1126 (11th Cir. 2012).

[52]    Id.

[53]    United States v. Teague, 953 F.2d 1525, 1533 (11th Cir. 1992).

With exception of the voir dire, I have reviewed the entire transcript of the Defendant's trial. The State's case was at the same time very strong and very weak. The case was strong in that there were five victims. DNA evidence linked the Defendant to three of the victims. Identification was not a real issue. There was the common stocking fetish. But there were also many, many inconsistencies between the victims' prior statements and their testimony at trial. And new victim statements kept emerging during the trial. At one point, the trial judge exclaimed:  "God, does this never stop with the State? I mean, I feel the pain of the defense in this case."[54] Although there was DNA evidence, the Well Spa rape victim identified someone other than the Defendant in a photo spread. The strength of the State's case weighs in favor of a finding of no prejudice. The weaknesses of the State's case weighs in favor of a finding of prejudice.

From the defense opening statement, it was clear that the only defense was consent. Because the Defendant did not testify, the prosecutor was able to argue persuasively in closing that there was no evidence of consent. Because the Defendant did not testify, there was no evidence to support the claim in opening statement that some of the women who he allegedly assaulted continued to provide him sex for

---

[54]     Transcript of Jury Trial [Doc. 11-5, at 132].

money after the dates of the alleged assaults.  Why does he have a pellet gun – that looks like a Glock pistol – in the car? Because the Defendant did not testify, there was no explanation. Under the peculiar facts of this case, there really was no downside to the Defendant testifying. All of the bad stuff, consorting with prostitutes, multiple victims, the DNA evidence, the stocking fetish, had already come out. Although sordid in the extreme, there was nothing in the Defendant's testimony at the motion for new trial that was incredible or fanciful. There is no way of knowing if the trial outcome would have been different if the Defendant had testified. But these questions undermine the reliability of the conviction in this case. This is a case where both prongs of the Strickland test have been satisfied by clear and convincing evidence. The writ must be granted. The Defendant's conviction is vacated. The State must afford him a new trial within 90 days or release him.

SO ORDERED, this 13 day of January, 2015.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge